**Kenneth R. YOTT, Plaintiff-Appellant,**

v.

**NORTH AMERICAN ROCKWELL CORPORATION and International Union, United Automobile Aerospace and Agricultural Implement Workers of America, Local 887, Defendants-Appellees.**

**No. 72–1383.**

United States Court of Appeals, Ninth Circuit.

July 25, 1974.

Dalford Todd (argued), Dallas, Tex., for plaintiff-appellant.

Robert N. Kohn (argued), El Segundo, Cal., Jack Levine (argued), Los Angeles, Cal., for defendants-appellees.

John F. Goemaat (argued), Equal Employment Opportunity Commission, Washington, D. C., amicus curiae.

Before BARNES, TRASK and GOODWIN, Circuit Judges.

## OPINION

BARNES, Circuit Judge:

Plaintiff-appellant Yott asserts, in apparent good faith, that his religious precepts and beliefs prohibit his joining a union, or paying union dues.

For almost twenty-two years, prior to January 14, 1969, plaintiff-appellant had been employed by North American Rockwell Corporation (hereinafter "NR") as an office equipment mechanic. He had been a faithful and satisfactory employee.

On October 6, 1968, NR and defendant International Union United Automobile, Aerospace and Agricultural Implement Workers of America, Local Union 887 (hereinafter "Union") entered into a collective bargaining agreement which required all employees to pay union dues. Plaintiff refused to enter into any Union membership, or to pay any dues or their equivalent, because of his religious beliefs, and so notified the defendants. The Union refused to waive any portion of its collective bargaining agreement; NR felt required under the terms of said Union agreement to discharge plaintiff-appellant on January 14, 1969.[1] Subsequent to his discharge, Yott found employment with a calculator company that sends Yott to service its machines used by NR.

Plaintiff filed a charge under the Civil Rights Act of 1964 with the Equal Employment Opportunity Commission (hereinafter "EEOC"). The Commission initially found that religious objections to union-shop agreements were not protected by Title VII, but subsequently withdrew that decision. Plaintiff then filed suit in the district court, and the EEOC has indicated its support of plaintiff's position by filing an amicus brief herein.[2]

The principal issue before us is the interpretation of Section 703(a)(1) of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2(a)(1), which prohibits discrimination because of religion,[3] and whether the discharge of appellant Yott was in violation of the statutory provisions of Section 703(a)(1).

Appellant urges that before us are two questions—has the employer discriminated against the employee, and was this discrimination because of religion? "If so, the Act makes it a violation. It is just that clear." (Op. Brief p. 8).

But the answers are not that easy. NR had signed a collective union agreement that included a union-shop clause previously approved both by the Congress of the United States and by the Supreme Court. (See Note 1 hereto,

1. The dismissal was required by the standard union shop clause, approved by Congress and the Supreme Court. Railway Employes' Dept. v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956).

2. We note that the EEOC as *amicus* in the present case takes a position contrary to that taken in its Sixth Annual Report as brought to our attention by NR. (NR's Brief, pp. 12, 13.)
    "The Equal Employment Opportunity Commission itself has, as recently as March 30, 1972, the date it issued its Sixth Annual Report, recognized that Appellees' action of discharging Appellant was consistent both with the NLRA and Title VII. The Commission's report summarized only four of 609 charges of discrimination based upon religion. The Commission felt this decision was of such importance as to include it in the EEOC

report to the President of the United States, the President of the Senate and the Speaker of the House: .
    'The Commission was also required to determine whether an employee in a union shop may refuse to pay union dues on the grounds that such payments are prohibited by his religious beliefs. The Commission held that " . . . a union shop is not unlawful" and that Charging Party's refusal on religious grounds is protected by neither Title VII nor the First Amendment.' 6th Annual Report, Equal Employment Opportunity Commission, p. 12."

3. "(a) It shall be an unlawful employment practice for an employer—(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ."

and § 2, Eleventh of the Railway Labor Act, 45 U.S.C. § 152, Eleventh.)

Appellant relies on Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L. Ed.2d 965 (1963) and attempts to distinguish Dewey v. Reynolds Metals Co., 300 F.Supp. 709 (W.D.Mich.1969), rev'd 429 F.2d 324 (6th Cir. 1970), aff'd by an equally divided Court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). Unfortunately, both of these cases are "refusal to work" cases "involving religious holidays" as distinguished from the factual situation here.

Nor can we hold as suggested by appellant, that conscientious objector military service cases are similar. No law of the land requires plaintiff to work only at NR.

Appellant recognizes that there are cases holding against his position. International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L. Ed.2d 1141 (1961); Railway Employes' Dept. v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); Otten v. Baltimore & Ohio R.R., 205 F.2d 58 (2d Cir. 1953); Linscott v. Millers Falls Co., 440 F.2d 14 (1st Cir. 1971), cert. denied, 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed.2d 116 (1971); Gray v. Gulf, Mobile and Ohio R.R., 429 F.2d 1064 (5th Cir. 1970); Wicks v. Southern Pacific Co., 231 F.2d 130 (9th Cir. 1956), cert. denied, 351 U. S. 946, 76 S.Ct. 845, 100 L.Ed. 1471 (1956). Appellant suggests that these are all Railway Labor Act (hereinafter "RLA") or National Labor Relations Act (hereinafter "NLRA") cases.

Appellant may be right that all the cases *up to Linscott* have to do with the RLA, "allowing Union shops as to Railways." But if Congress, in its wisdom, can require railroads to have compulsory union shops, and the Supreme Court has approved and held constitutional such a requirement, it can allow and require manufacturing businesses, such as NR, to have compulsory union shops. Congress originally *permitted* such union shops, and then *required* them, and thus has given "such agreements 'the imprimatur of the federal law'." *Linscott, supra,* 440 F.2d at 16. "The federal statute is the source of the power and authority by which any private rights are lost or sacrificed." *Hanson, supra,* as quoted in *Linscott, supra,* at 16.

Whether rightly or wrongly, Union security agreements such as the one here involved, have long been favored by Congress.

The National Labor Relations Act (NLRA) as amended by the Taft Hartley Act, explicitly authorizes such agreements, Section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3) states in part:

> ". . . nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership . . ."

The Congressional intent in allowing union shop agreements in Section 8(a)(3) is expressed by the following statement from the legislative history:

> "It seems to us that these amendments [the proviso portions of Section 8(a)(3)] remedy the most serious abuses of compulsory union membership and yet give employers and unions who feel that such agreements promote stability by eliminating 'free riders' the right to continue such arrangements." S.Rep. No. 105 on S. 1126, 80th Cong., 1st Sess. 7 (1947); *See also* Int. Asso. of Machinists v. Street, *supra,* 351 U.S. at 761, 81 S.Ct. 1784.[4]

---

4. Congress has repeatedly declined to enact exceptions to the union security provisions of the NLRA. H.R. 11666, 89th Cong., 1st Sess. (1965) (To exempt persons with religious convictions from the union membership requirements of NLRA) (Referred to committee was only action taken); S.3203, 89th Cong., 2d Sess. (1966) (To protect persons conscientiously opposed to Union membership) (Defeated); S.3153, 89th Cong., 2d Sess. (1966) (Made it unfair labor practice under NLRA to require persons conscien-

Appellant and *amicus* EEOC argue that the discharge of appellant (whose refusal to tender the periodic dues required under the collective bargaining agreements was based on his religious convictions), constituted religious discrimination and therefore violates Title VII. In contending that the union security clauses of the RLA and NLRA are qualified or modified by the provisions of Title VII, EEOC relies primarily on Norman v. Missouri Pacific Co., 414 F. 2d 73 (8th Cir. 1969) (*Amicus* brief pp. 24–26) (*See also* Taylor v. Armco Steel Corp., 429 F.2d 498 (5th Cir. 1970); Tipler v. E. I. duPont deNemours and Co., 443 F.2d 125 (6th Cir. 1971)), for the proposition that "Title VII shall be applied in every instance in which such application is not clearly prohibited by the other statute." (*Amicus* brief pp. 24–25). The language in *Norman* is inapposite to the issues in this case because *Norman* did not involve conduct which is explicitly permitted or authorized by the NLRA or RLA, as here.

In *Norman*, Negro train porters alleged discrimination against them by the railroad company under Title VII. The Eighth Circuit, in holding that the plaintiffs stated a cause of action held they were not confined to their administrative remedies under the RLA, but were governed by Title VII because "the plaintiffs here seek not a determination of bargaining representative but the termination by the Railroad of racially discriminatory practices respecting assignment, classification, terms and conditions of employment. These are statutory rights, not contractual rights embodied in collective bargaining agreements." *Id.* 414 F.2d at 83. The court further commented that the RLA does not concern itself with civil rights whereas the legislative intent of Title VII was toward eliminating discriminatory employment practices. Thus, *Norman's* holding was concerned with conduct not explicitly covered by RLA and the application of Title VII thereto. Similarly Title VII's application to NLRA would be in regulating conduct not explicitly regulated by the labor acts. Thus, we cannot agree that Congress's intent in Title VII was to modify the Congressional authorization in NLRA of union security clauses as alleged and implied by *amicus*.

The final argument of appellant and also the EEOC with respect to a Title VII violation is that the appellees must accommodate appellant's religious needs unless the accommodation would be unreasonable. They cite the EEOC's Guidelines on Discrimination Because of Religion, 29 C.F.R. § 1605.1,[5] question-

tiously opposed to union membership to join 93d Cong., 1st Sess. (1973) (Amend NLRA a union) (Defeated) ; and recently, S.2108, to make it an unfair labor practice for a labor organization to discriminate on account of race, color, religion or national origin) (Referred to Com. on Labor and Public Welfare). It is for Congress, which authorized union security clauses, not the judiciary, to carve out exceptions to those clauses.

5. On July 10, 1967, the EEOC promulgated "Guidelines on Discrimination Because of Religion."

PART 1605—GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION

§ 1605.1—Observance of the Sabbath and other religious holidays

(a) Several complaints filed with the Commission have raised the question whether it is discrimination on account of religion to discharge or refuse to hire employees who regularly observe Friday evening and Saturday or some other day of.

the week, as the Sabbath or who observe certain special religious holidays during the year and as a consequence, do not work on such days.

(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodation to the religious needs of employees and prospective employees where such an accommodation can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

(c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of

ing the validity of the handling of the accommodation issue in Dewey v. Reynolds Metals Co., *supra*, as the law in the area, and next suggest that the March 6, 1972 amendment to Title VII (Section 701(j) of Title VII as amended) codifying the accommodation section of the EEOC regulation, should be considered in interpreting Title VII's application to the appellant's discharge in 1969.

In *Dewey*, the Sixth Circuit rejected the specific regulation relied on here by the EEOC. 429 F.2d at 334. However, the same circuit has recently reconsidered the doubts that it expressed in *Dewey* about the constitutional validity of the EEOC regulation in Reid v. Memphis Publishing Co., 468 F.2d 346 (6th Cir. 1972). The court in *Reid* stated that:

"Whatever doubts there may have been about the constitutionality of this regulation or its consistency with the statute have been, we believe, laid to rest by a unanimous Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)." *Id.* at 350.

The court in *Reid* went on to hold that the Supreme Court's "reasoning convinces us that 29 C.F.R. § 1605.1 (1972) was both effective and valid at the time of . . . [Reid's claimed religious discrimination]." *Id.*

In *Duke Power*, Chief Justice Burger, in his opinion for the Court discussed the "business necessity" test.

"The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." 401 U.S. at 431, 91 S.Ct. at 853.

". . . Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." 401 U.S. at 432, 91 S.Ct. at 854.[6]

On March 24, 1972, Congress amended Title VII to incorporate the substance of the EEOC Regulation 1605.1:

"(j) The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." Act of March 24, 1972, Pub.L. No. 92–261, § 701(j), 86 Stat. 103. (42 U.S.C. § 2000e(j)).

Although the requirement of accommodation is now a part of Title VII, there was clearly no statutory accommodation section at the time of Yott's discharge. However, as expressed in an extensive summary of the legislative history of this amendment in Riley v. Bendix Corp., 464 F.2d 1113 (5th Cir. 1972), "the regulation . . . did express the prior intention of Congress. This subsequent congressional affirma-

---

his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodation to the religious needs of the employee unreasonable.

(d) The Commission will review each case on an individual basis in an effort to seek an equitable application of these guidelines to the variety of situations which arise due to the varied religious practices of the American people.

**6.** Since we hold that if a reasonable accommodation can be reached between the parties it must be offered appellant Yott and such determination is for the District Court on remand (*infra*), we leave analysis of whether the "business necessity" test would be met for the District Court's determination. We are certain that the court will keep in mind that the purpose of a union security clause is to insure that all who receive the benefits of the collective bargaining agreement pay their fair share. "Free riders" are discouraged. In effect stability is promoted by reducing potential labor strife, thus increasing the efficient operation of the business.

tion strengthens our conclusion about the validity of the regulation." 468 F. 2d at 351.

■ Thus, we agree with *Reid* and find that accommodation is required. The question is whether or not North American Rockwell and the Union could make a "reasonable accommodation" to appellant Yott's religious beliefs "without undue hardship." *See* 468 F.2d at 350. This determination should be for the district court to determine upon remand, and we so hold.

We note, however, that this is not a "refusal to work" case in which a reasonable accommodation is easily provided. We are not certain that any accommodation is available.[7] If appellees are able to demonstrate that any suggested accommodation would impose undue hardship on the Union or on the employer's business then Yott's discrimination claim should fail.

■ The other issue with which we find it necessary to deal is appellant's contention that his discharge was an infringement on the free exercise of religion as guaranteed by the First Amendment. We are compelled to disagree with appellant's contention.

Many Supreme Court and Circuit Court cases support the constitutionality of union security clauses when "minor infringements on First Amendment rights" are concerned. Int. Asso. of Machinists v. Street, *supra*; Railway Employes' Dept. v. Hanson, *supra*; Buckley v. American Federation of Television and Radio Artists, 496 F.2d 305 (2d Cir. 1974); Linscott v. Millers Falls Co., *supra*; Gray v. Gulf, Mobile & Ohio R.R., *supra*; Wicks v.

Southern Pacific, *supra*; Otten v. Baltimore & Ohio R.R., *supra*.

In *Linscott* (which in the determination of the free exercise issue, the court was faced with the same problem as here—discharge for refusal to pay dues for religious reasons), the court found that the predominant justification for allowing such minor infringement or impairment upon First Amendment rights is the federal interest in preserving industrial peace and thus assuring the free flow of interstate commerce.

"[2] The more difficult question is that posed by the First Amendment: whether the governmental interest expressed in the labor legislation can justify this interference with plaintiff's competing interest in choosing the employment she wishes without cost to her religious convictions. Freedom of exercise of religion is not absolute. Plaintiff concedes, as she must, that there must be a 'balancing' and that the governmental interest may be paramount if it is 'compelling.' Sherbert v. Verner, 1963, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965. The elements of such a balancing test include, in addition to the importance of the governmental and religious interests, the degree of interference with the religious practice. *See* Clark, Guidelines for the Free Exercise Clause, 83 Harv.L.Rev. 327 (1969); Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, 80 Harv.L.Rev. 1381, 1390 (1967). We turn, therefore, to an appraisal.

A strong governmental interest in the union shop was found in *Hanson*. Some employees claimed that being

7. We assume that appellant, because of his religious beliefs, may not desire to pay an amount equal to union dues or any other amount of money to the Union, and will still refuse to become a member of the Union.

The only succinct expression in the appellant's complaint (Tr. 107–108) and his brief (Op. Br., p. 4) concerning what constitutes appellant's objection because of "sincere religious beliefs" is that:

". . . he may not become a member of a Union or pay *dues* or *join* any other sectarian or fraternal organization." (Tr. 107–108). (Emphasis added.)

This is at least somewhat inconsistent with his statement that he does not object to "obligations imposed by Federal, State and Local governments, including the payment of taxes or compulsory military service." (Tr. 108).

obliged to join the union deprived them of freedom of association as guaranteed by the First Amendment, and that compelling the payment of dues violated Fifth Amendment due process. As against these contentions the Court held that '[i]ndustrial peace along the arteries of commerce [as] a legitimate objective,' 351 U.S. at 233, 76 S.Ct. at 719, justified the legislation. Undoubtedly the Court recognized the validity and importance of the congressional purpose to achieve uniform union membership, both to further peaceful labor relations and, as desirable for its own sake, to require a fair sharing of the costs of collective bargaining." *Id.* 440 F.2d at 17.

However, because "Hanson explicitly reserved some First Amendment questions," the court in *Linscott*, though finding such questions were not raised in *Linscott*, went on to "a balancing of the interests," the basis of Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (a state's refusal to pay unemployment compensation; *i. e.*, a matter involving the fisc). 440 F.2d at 17, 18.

The majority in *Linscott* then stated:

"In the present case the interests are not merely that of the plaintiff versus the cost to the fisc; opposed to plaintiff's interest are both the public and private interests in collective bargaining and industrial peace.

". . . We conclude that in weighing the burden which falls upon the plaintiff if she would avoid offending her religious convictions, as against the affront which sustaining her position would offer to the congressionally supported principle of the union shop, it is plaintiff who must suffer. We agree with the Fifth Circuit. Gray v. Gulf, Mobile & Ohio R. R., n. 1, ante; *cf.* Cap Santa Vue, Inc. v. N.L.R.B., D.C.Cir., 1970, 424 F.2d 883." *Id.* 440 F.2d at 18.

Further distinguishing *Sherbert*, the court in *Linscott* stated that:

"Furthermore, plaintiff's burden is not as severe as was Sherbert's. Her alternative is not absolute destitution. The cost to her is being forced to take employment in a nonunion [shop]— here, less remunerative employment." *Id.* at 18.

The same holds true for Yott in the case at hand. His alternative is not destitution but merely employment in a nonunion shop—a possibility clearly established by his own present employment.

Quoting the words of the Fifth Circuit in Gray v. Gulf, Mobile & Ohio R. R., *supra* 429 F.2d at 1065:

"We are called upon to resolve a clash between enforced union adherence and an individual conscience which forswears union allegiance."

In *Gray*, recognizing that "the constitutional issue is sensitive and perhaps far-reaching," *Id.* at 1065, the Fifth Circuit nevertheless, guided by previous Supreme Court teachings, denied relief to plaintiff. Gray, a Seventh Day Adventist, followed the religious tenets that man is a free moral agent; that he individually must make his own decision whether or not to join a labor union, he should suffer no penalties (such as being required, whether or not a member, to pay dues or to pay the equivalent of dues to some charitable organization). *Id.* at 1066–1067, n. 4.

In *Gray*, the union suggested that he should pay the required dues and fees without actually becoming a member of the union. The court found that such an arrangement does not violate the First Amendment, *Id.* at 1072 citing *Hanson, supra,* and *Street, supra,* as dispositive of the issue. *Accord*, Hammond v. United Papermakers & Paperworkers Union, 462 F.2d 174 (6th Cir. 1972), cert. denied 409 U.S. 1028, 93 S.Ct. 464, 34 L.Ed.2d 322 (1972), in which the Sixth Circuit followed the First Circuit's decision in *Linscott* and the Fifth Circuit's in *Gray*.

The order of the district court dismissing for failure to state a cause of

action upon which relief could be granted is reversed, and the case remanded for further consideration by the district court in accordance with this opinion.