533 F.2d 163
 12 Fair Empl.Prac.Cas. 1549,
12 Empl. Prac. Dec. P 11,002, 78 Lab.Cas. P 11,462
 Howard COOPER et al., Plaintiffs,
Rita Kimbell and Howard T. Hopkins, Plaintiffs-Appellants,
v.
GENERAL DYNAMICS, CONVAIR AEROSPACE DIVISION, FORT WORTH
OPERATION, et al., Defendants-Appellees,
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS, AFL-CIO, et al., Defendants-Appellees-Appellants.
 No. 74-3151.
 United States Court of Appeals,
Fifth Circuit.
 June 9, 1976.
 
 David Watkins, Dallas, Tex., for plaintiffs-appellants.
 Richard S. Cohen, EEOC, Charles L. Reischel, Washington, D. C., for E.E.O.C.
 Louis A. Jacobs, Sp. Counsel to Atty. Gen., Columbus, Ohio, for Ohio Civil Rights Commission.
 J. Olcott Phillips, Fort Worth, Tex., for Gen. Dynamics.
 Otto B. Mullinax, L. N. D. Wells, Jr., Dallas, Tex., for Intl. Assoc. etc.
 Sam Houston Clinton, Jr., Austin, Tex., for Dist. Lodge 776, and others.
 Appeals from the United States District Court for the Northern District of Texas.
 Before BROWN, Chief Judge, RIVES and GEE, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 Appellants work for appellee General Dynamics (Employer) on a federal enclave in the Fort Worth area, where union security agreements are permitted,[1] and once belonged to defendant union and its defendant local (hereafter, collectively, the Union).
 
 
 2
 Appellant Kimbell's employment began in 1950, when she was already a Seventh Day Adventist. In the early 1960's, she withdrew from union membership on religious grounds. Appellant Hopkins' employment also dates from 1950, as does his union membership. He joined the Adventist Church in 1954 and withdrew from the union on religious grounds in 1967. In 1972, for the first time, Employer and Union incorporated a union security provision in their collective bargaining agreement, one of the "agency shop" variety.[2]
 
 
 3
 Upon learning that financial support of the Union would be required of him by this new provision, each appellant protested to Employer and Union without success, commenced setting aside in trust the amount of such dues for contribution to some nonreligious charity if that were found acceptable, and went to court. After various vicissitudes, unnecessary to detail, the matter came to trial before our district court, where Employer and Union prevailed.[3]
 
 
 4
 At trial the legal issues were three: the effect, if any, of the "religious accommodation" provisions of the amended Civil Rights Act on the application of the agency shop provision to appellants; Employer's right to recover from Union indemnity for attorney's fees incurred in resisting appellants' suit; and the effect of the Texas Right-to-Work law on the controversy. The last of these is not before us because appellants have not challenged on appeal the district court determination that state law lacked force on the federal enclave. As to the others, the court refused relief to appellants on the reasoning that their beliefs about supporting the Union financially, while both religious and sincerely held, were illogical thus retermitting the issue of whether the beliefs could be accommodated without undue hardship and required Union to indemnify Employer for its attorneys' fees. We reverse these holdings
 
 
 5
 and remand for decision of the accommodation issue. The
 
 
 6
 Civil Rights Act and the National Labor Relations
 
 Act: Relevant Legislative, Judicial and
 Administrative Background
 
 7
 These pit the Union's entirely understandable desire that employees who receive the benefit of collectively-bargained wages and other benefits should bear a fair share of the cost of obtaining them against appellants' belief that supporting a union in any way is a Godless act which they should not be made to do to keep their jobs. Mercifully, in deciding this distressing issue, we are asked to write on small portions only of an already-crowded slate.
 
 
 8
 On the Union's side, there can be no doubt that the agency shop provision here in question is valid under the National Labor Relations Act,29 U.S.C. § 158 (1970), or that in the present state of constitutional law the first amendment does not shield appellants from discharge for refusing to abide by this provision. See Gray v. Gulf, M & O R.R., 429 F.2d 1064 (5th Cir. 1970), cert. denied, 400 U.S. 1001, 91 S.Ct. 461, 27 L.Ed.2d 451 (1971). As for appellants, we must take as given the district court's findings, based on evidence substantial and sufficient, that the Seventh Day Adventist Church maintains a long-established doctrine that joining or financially supporting a labor union is an act inconsistent with the commandment to love one's neighbor, the employer; that appellants are each members of that church; and that each holds with sincerity and as a matter of religious conviction that by supporting a union he places his soul in jeopardy.[4] The matter thus comes down to statutory construction: what has Congress said should be done about such painful collisions?
 
 
 9
 Section 703 of the Civil Rights Act of 1964 provides, in pertinent part:
 
 
 10
 (a) It shall be an unlawful employment practice for an employer
 
 
 11
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . .
 
 
 12
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion . . . .
 
 
 13
 (c) It shall be an unlawful employment practice for a labor organization
 
 
 14
 (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his . . . religion . . .
 
 
 15
 (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's . . . religion . . .
 
 
 16
 (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.
 
 
 17
 42 U.S.C. § 2000e-2 (1970).
 
 
 18
 Initial EEOC guidelines promulgated on the subject, while recognizing a general obligation to accommodate employees' religious needs where this could be done without serious inconvenience, permitted an employer to adopt any "normal work week" and holiday schedule generally applicable to all employees, without regard to or accommodation of employees' religious observances, absent intent to discriminate on religious grounds. A subsequent and replacing regulation, however, adopted in 1967, took a firmer line: employers were required to make reasonable accommodation, short of undue hardship, to the religious practices of employees:
 
 
 19
 (b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.
 
 
 20
 (c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.
 
 
 21
 Initial decisions by the courts tended toward a narrow interpretation of the statute and guidelines. In Dewey v. Reynolds Metals Co., 429 F.2d 324 (1970), a divided Sixth Circuit held it a sufficient accommodation of Sabbath observance to permit the affected employee to arrange his own replacement, despite his protest that Sunday work was so inherently sacrilegious that his inducing another to do it in his place would be sinful. That decision was affirmed by an equally divided Supreme Court.[5] Central to the reasoning of the circuit court and of several contemporaneous district court decisions[6] was a distinction between discrimination and a mere refusal to accommodate normal work rules of general application to the complainant's special religious claims. In the face of an ambiguous statute, of changing EEOC regulations, and of the notion intimidating at first blush that a broad construction might cripple employers in a cross fire of religious demands, the courts[7] by 1971 appeared to be settling into a view that the statute concerned itself primarily, if not solely, with Sabbath observance[8] and that general rules, applied without discriminatory intent, were acceptable even though their effect in practice might not always be impartial. In 1972, however, with unusual promptness and unanimity, Congress responded to this modest trend by making clear that this was not what it meant.
 
 
 22
 The 1972 Amendment Defining Religion: Limited to Sabbatarianism?
 
 
 23
 Acting in what can only be viewed as a direct response to the Sixth Circuit's expressed doubts in Dewey about the EEOC's power to adopt such regulations as its revised guidelines explicit reference to the decision and its affirmance by equal division is made in the legislative history, as is shown in our next footnote Congress added to the Civil Rights Act of 1964 a definition of religion. This "definition," set out below in the margin, exhibits the curious feature of defining as religious every aspect of observance, practice, and belief of that nature except whatever the affected employer can show he cannot accommodate without undue hardship to his business activities. Nevertheless, though it may make the stylist blanch, the definition possesses that most precious of statutory qualities: it cannot be misunderstood. If the employee's conduct is religiously motivated, his employer must tolerate it unless doing so would cause undue hardship to the conduct of his business. And if the text left room for doubt, as it does not, the legislative history removes it.[9]
 
 
 24
 We are unable to reconcile with section 701(j)'s sweeping terms ("all aspects of religious observance and practice, as well as belief . . . .") the Union's suggestion that Congress intended by it to protect Sabbath observance only. When the legislator speaks plainly, he is entitled to be taken at face value. The language chosen is broad broader can hardly be imagined and entirely extravagant to a mere concern for Sabbatarianism or any other particular doctrine or observance. Instead, the definition is what may be termed an operative one: all forms and aspects of religion, however eccentric, are protected except those that cannot be, in practice and with honesteffort, reconciled with a businesslike operation. The Civil Rights Act extends to the religious doctrine implicated here.[10]
 
 
 25
 Other Union Contentions Regarding Section 701(j)
 
 
 26
 Three other contentions by the Union require treatment. The first, an assertion that section 701(j) applies only to employers, relates to a point on which the court has divided and which is treated below in the section of this opinion entitled "Accommodation and Hardship: By Whom and to Whom?"
 
 
 27
 Next, in two related arguments, the Union maintains that section 701(j) and the other provisions of Title VII may not be appropriately viewed as exemptions from the application of agency shop provisions sanctioned by section 8(a)(3), pointing to that section's "supremacy clause"[11] and to the fact that when Congress wished to provide a "religious conviction" exemption from union security agreements for employees of health care institutions, it did so by a severely limited and narrow amendment to the National Labor Relations Act itself.[12] From these considerations, it is said to follow that Congress would not likely have intended to enact a broad and general exemption to 8(a) (3) for religious scruples by passing and later amending Title VII.[13]
 
 
 28
 We conclude, however, that the language of 8(a)(3) to which the Union refers, commencing with "nothing in this subchapter," does not bear the sense that the Union seeks to place upon it. The passages of 8(a)(3) that authorize union security agreements are exceptions to the main body of that section, both structurally (as contained in a proviso) and conceptually (as reservations from the thrust of the section's major idea). Language in other portions of the section, and doubtless elsewhere in statutes of the United States, can be read as conflicting with this union-security proviso of 8(a)(3). It is, therefore, not surprising that the section incorporated language making plain that, despite these seeming conflicts, union security agreements are authorized, anything in the statutory system as then constituted notwithstanding. So far, so good. But to go on, as would the Union, to a conclusion that the quoted language is a true supremacy clause, which for all time lifts section 8(a)(3) above the general level of the United States Code to a position comparable to the Constitution, would be a startling measure indeed. For various reasons, it seems unlikely that this was Congress' intent.
 
 
 29
 In the first place, a heirarchy of statutory dignities is foreign to our governmental scheme. We have constitutions that take permanent precedence over statutes; we are not accustomed to statutes that do so, and congressional intent to enact such a thing would be novel, a thing we would not lightly discern from language susceptible of other meanings. Second, the provision has an entirely rational and necessary function in the union security proviso of section 8(a)(3) that discussed in the next preceding paragraph so that we need not seek its raison d'etre in such an unusual purpose as that advanced by the Union. Finally, Congress' recent passing of the health-care-institution exemption itself, codified at 29 U.S.C. § 169, without undertaking to amend section 8(a)(3) as a condition precedent to that action, indicates that it accords to section 8(a)(3) no such commanding status as the Union advocates.
 
 
 30
 And indeed we think Congress rather plainly correct in this perception, for neither the passage of the health-care exemption nor the passage and amendment of Title VII precludes or trenches in any direct way upon any employer's making a union security agreement. He and his union can make any they like and enforce it in the general run of cases in all except the unusual one where compliance would run counter to a particular employee's religious conviction, sincerely held, that can be accommodated without undue hardship.
 
 The Indemnification Claim
 
 31
 In closing the majority portion of this opinion, we dispose of one last claim the Union's contention that the trial court improperly required indemnification of Employer for attorneys' fees and expenses incurred in defending this cause of action. We agree with the Union. The district court based its award on an indemnity provision of the collective bargaining agreement, which provided that the local union would
 
 
 32
 defend, save, hold harmless and indemnify (Employer) from any and all claims, demands, suits or any other forms of liability that . . . arise out of the execution, placing in effect or carrying out of the terms of (the Article concerning payment of union dues).
 
 
 33
 But the local, which stood ready to defend Employer, was never requested to provide representation. Employer wanted its own counsel, fearing that loss of this case might adversely affect its interests in other litigation.[14] Thus, Employer chose to retain its own attorney for its own reasons and purposes; and under these circumstances, the indemnity provision does not apply.
 
 
 34
 Accommodation and Hardship: By Whom and to Whom?
 
 
 35
 Chief Judge Brown and the writer concur in holding that consideration of all reasonable accommodations of appellants' religious beliefs, including one which permits their nonpayment of union dues or the equivalent while continuing regular work assignments with their employer, is mandated by the sweep of section 701(j). For the reasons stated in his separate opinion, Judge Rives does not agree that such an accommodation should be considered, though he agrees that accommodations short of this should be. Judges Brown and Rives concur that, whatever range of accommodations is to be contemplated, hardship to the union, as well as hardship to the Employer, must be considered in evaluating them. Because of what the statute says, I am unable to agree.
 
 
 36
 Section 703 of the Civil Rights Act forbids, inter alia, an employer to discharge an employee for his religion and forbids a union to make or try to make an employer do so. Section 701(j) of the same Act defines "religion" as including every religious belief, observance or practice "unless an employer demonstrates that he is unable to reasonably accommodate to (it) without undue hardship on the conduct of the employer's business." (emphasis added). This is all. My Brothers add to the definition the factor of "undue hardship to the union." As I read Judge Brown's opinion, their reasons for doing so are that the union has a serious interest in the matter, that the statute would be more symmetrical this way (if one is to have an escape hatch, the other should have it, too), that a weakened union may produce hardship to the employer, and that such a statute would be more in line with "the overriding and evident policies of Congress." With deference, none of these reasons persuades me, or even approaches persuading me, that when Congress has said A, in words which admit of neither construction nor misunderstanding, we should say A and B.
 
 
 37
 As for the reasons themselves, I answer: Indeed, the union does have a serious interest in this matter, one which should be presented to Congress for its consideration rather than to us. As for symmetry, neither the Labor Relations Act nor the Civil Rights Act is notable for it; each prohibits things to some people but not to others, and the thrust of each is toward equalizing unequal situations rather than an abstract symmetry. The next notion, that a weakened union may be seen as a hardship to the employer is conceivable but seems foreign to the perceptions both of Congress (which specifically permitted right-to-work laws and decreed employee elections that often result in no union at all) and of most employers who appear before us. Finally, the overriding congressional policies which my Brothers find evident are not so clear to me. I prefer to seek these in the words of the statute, what the Congress has solemnly said on this particular subject.
 
 
 38
 I therefore dissent from the result insofar as it directs the trial court to weigh union hardship in determining whether appellants' beliefs are a "religion" for purposes of section 701(j).[15] I do so because, in sum, under this direction that court may find that these admittedly religious beliefs can be reasonably accommodated by the employer without undue hardship to the conduct of his business all that the statute provides and still hold that they are not entitled to the protection of a statute specifically enacted to do so.
 
 Conclusion
 
 39
 The judgment of indemnity is REVERSED, and the judgment is here RENDERED for IAM and Lodge 776. The judgment in favor of General Dynamics is REVERSED and REMANDED for further proceedings not inconsistent with the consensus majority opinion, that is, for consideration and decision by the court whether appellants' religious doctrine here involved can be reasonably accommodated by the Employer and the Union without undue hardship to the conduct of the Employer's business or to the Union.
 
 
 40
 JOHN R. BROWN, Chief Judge (specially concurring):
 
 I.
 
 41
 I concur fully in the result and the Court's opinion so far as it goes. My difference is that it does not go far enough. And lest its silence be misinterpreted as an implied rejection I would hold that the inquiry on hardship should not be confined to the employer alone. The inquiry must also include hardship to the Union.
 
 II.
 
 42
 A majority is in agreement apart from the question urged so well by Judge Rives' dissent on the immunity of Union dues from the reach of Section 701(j) that the substantive restraints of Section 701(j) forbidding religious discrimination applies to employer and Union alike and each has a duty of accommodation.[1]
 
 
 43
 But the remand ordered confines the question of hardship to hardship to the employer alone with not a single mention of hardship to the Union. I am of the firm opinion that where the asserted religious discrimination grows out of a collective bargaining contract, as it assuredly does here, the Union as a very real party in interest, has the right to demonstrate that accommodation would cause undue hardship to it and its interest. Thus I am in full agreement with part IV A of Judge Rives' opinion. The result is that we thereby construct a majority on this issue. On remand the Court must have appropriate hearings on hardship to both the employer and Union.
 
 III.
 
 44
 Of course there can be no running from the express language of Congress. The hardship is, by words, confined to "undue hardship on the conduct of the employer's business" (emphasis supplied). But reason argues overwhelmingly that in the structure of this statute Congress could not have thought that for two parties under the same stringent substantive prohibition one has an escape hatch of undue hardship denied to the other growing out of the common industrial setting.
 
 IV.
 
 45
 Of course one way to get to this destination is to reason that the Union's legitimate self-interest is an inevitable part of the inquiry into hardship to the employer. We must remember that the aim of all federal employment relationship legislation is the idyllic goal of industrial peace. The quest, of course, is not for some unrealistic hope for tranquility. The very relationship of management-labor poses contention in the very best use of that term. What is sought is a means by which these natural irrepressible continuous contentions can find resolution through civilized means not the brute strength of an employer's goon squad or violence on the picket line.
 
 
 46
 Our national commitment is to negotiation, dialogue, compromise and adjustment. But there cannot be this sort of negotiation without negotiators. There is scarcely a situation proving so much the old saw that it "takes two to tango". Management, historically, has the resources to mount its vigorous negotiation. Workers, on the other hand, so our history proves are disadvantaged unless and the unless is a big one there is organization and the resources that comes from collective purpose and commitment. It is, therefore, to management's self-interest in the goal of peaceful settlement of the inevitable economic clashes that its adversary have, not necessarily equal, but at least formidable strength. This can come about only by resources. Resources include not only reasonable solidarity in employee support, but in the means by which to lend effective, not just zealous, support.
 
 
 47
 That means that in the process or art by whatever name it is described of negotiation the Union as the ordained collective bargaining representative must have strength. Strength comes not alone from money, but money is indispensable as these combatants enter the lists.
 
 V.
 
 48
 But to me it would be a mistake and a disservice to the overriding and evident policies of Congress in its aim to blot out this blight on a meaningful democracy to have to go to this indirection to find a legitimate interest in the maintenance of a strong vigorous advocate in this process of bargaining.
 
 
 49
 The Union should therefore have the right equally with the employer to demonstrate if it can that the practice condemned cannot be avoided without undue hardship to its legislatively ordained role.
 
 VI.
 
 50
 It is therefore clear to me that in assaying this Section 701(j) undue hardship factor, hardship to the Union as well as hardship to the employer should be considered.
 
 
 51
 RIVES, Circuit Judge (concurring in part and dissenting in part):
 
 I.
 
 52
 I concur with the majority's disposition of the indemnity claim. Clearly, the district court erred in requiring the Union to indemnify the employer for his litigation costs.
 
 II.
 
 53
 I specially concur with part of the majority's decision concerning the employees' Title VII claim. With regard to this claim, the parties on appeal have presented us with the question of whether Congress, by enacting and later amending Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., provided an exception to the application of the agency shop provisions for employees who have religious objections to labor unions. See Pet. Brief at 9 n. 11; Resp. (IAMAW) Brief at 11. This question, however, actually involves two separate issues: (1) Does Title VII impose a duty on employers and unions to accommodate the religious beliefs of employees and (2), if such a duty exists, does its scope include granting employees with religious objections to labor unions an exemption from paying dues to a union which has negotiated an agency shop agreement with the employer pursuant to the National Labor Relations Act (NLRA), now appearing at 29 U.S.C. § 158(a)(3) (1970).[1] The district court dismissed the Title VII claim on the ground that the employees' religious ideas were specious and that the court saw no conflict between their religious beliefs and the union security agreement. I agree with the majority that the district court's reasoning was not permissible. The district court itself found that, "All of the plaintiffs are sincere in their religious convictions and are now conscientiously committed to their church's position that its members should not belong to or contribute financial support to a labor organization." (App. 94.) This finding establishes that plaintiffs' religious beliefs are indeed incompatible with the agency shop agreement, and the district court should not have analyzed the logic of the assumptions underlying these beliefs. United States v. Seeger, 1965, 380 U.S. 163, 184-185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733, 747. Given this conflict between employees' religious beliefs and a job-related requirement, the court should have proceeded to decide if the Union and employer have a duty to accommodate under Title VII and, if so, the scope of this duty in light of the Union's right under the NLRA to contract with the employer for an agency shop.III.
 
 Duty to Accommodate
 
 54
 In 1964 Congress passed Title VII of the Civil Rights Act, a statute making it an unlawful employment practice for an employer to discriminate against his employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000-2(a) (1970). The initial guidelines issued in 1966 by the Equal Employment Opportunity Commission (EEOC)[2] interpreted the Act's prohibition against discrimination on religious grounds as imposing a duty on employers to accommodate the "reasonable religious needs of employees and, in some cases, prospective employees where such accommodation can be made without serious inconvenience to the conduct of the business." 29 C.F.R. § 1605.1(a) (2). The guidelines went on to state, however, that the employer was free to establish a normal work week generally applicable to all employees, "notwithstanding that this schedule may not operate with uniformity in its effect upon the religious observances of his employees." 29 C.F.R. § 1605.1(a)(3). In 1967 the EEOC adopted new guidelines reinterpreting the employer's duty not to engage in religious discrimination. These new regulations contained no reference to the normal work week schedule and included a provision placing on the employer the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable. 29 C.F.R. § 1605.1(c). These changes did not go without notice in the Sixth Circuit's opinion in Dewey v. Reynolds Metals Co., 6 Cir. 1970, 429 F.2d 324, a case involving the discharge of an employee for refusing to work on the Sabbath. Although the court held that the 1966 guidelines applied to the case under review, it went on to observe that the statute (42 U.S.C. § 2000e-2(a)) did not require an employer to make reasonable accommodation to the religious needs of his employees and thus questioned the authority of the EEOC to adopt such a regulation. 429 F.2d at 331 n. 1. The Supreme Court affirmed by an equally divided vote. 401 U.S. 932, 91 S.Ct. 919, 28 L.Ed.2d 212 (1970).
 
 
 55
 The Randolph Amendment to the Equal Employment Opportunity Act of 1972 was a direct response to the Dewey decision. This amendment, sponsored by Senator Randolph of West Virginia, defined "religion" as follows:
 
 
 56
 "(j) The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).
 
 
 57
 The Union contends that, despite the broad language used in this definition, the Randolph Amendment was intended to have a fairly limited purpose. Reference is made to the legislative history where Senator Randolph, a member of a small sect known as Seventh-Day Baptists,[3] told his fellow Senators of his concern over "the inability of employers on some occasions to adjust work schedules to fit the requirements of the faith of some of their workers." 118 Cong.Rec. 705 (1972). Seizing on this language, the Union contends that there is a duty to accommodate only those religious beliefs concerning observance of the Sabbath and related problems. Indeed, the regulation issued by the EEOC interpreting Title VII's proscription against religious discrimination is titled "Observation of the Sabbath and Other Religious Holidays." 29 C.F.R. § 1605.1 (1975). The official position of the Commission, however, is that Title VII does require employers and unions to accommodate an individual's religious belief against financially contributing to a labor organization. The language of the statute ("All aspects of religious observance and practice, as well as belief") does indeed extend beyond Sabbatarianism to include any belief that can be termed "religious." Authority for the proposition that this duty to accommodate attaches to religious objections against labor unions can be found in the Ninth Circuit case of Yott v. North American Rockwell Corporation, 9 Cir. 1974, 501 F.2d 398. Although the issue was uncontested, Title VII has been applied in this Circuit to a situation where an atheist was forced to resign her job as a result of having to attend business meetings where devotionals were given. Young v. Southwestern Savings and Loan Association, 5 Cir. 1975, 509 F.2d 140. In light of the above, I think that Title VII does place a duty of accommodation on the employer and also on the Union.
 
 IV.
 Scope of the Duty to Accommodate
 A. Hardship
 
 58
 Under the provisions of the statute, the duty to accommodate is limited by an exception for hardship. 42 U.S.C. § 2000e(j) provides:
 
 
 59
 ". . . unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."
 
 
 60
 Although, for the reasons stated herein at length, I am of the view that the duty to accommodate does not include an exemption to paying union dues under an agency shop agreement, since the Court holds otherwise, I concur in Chief Judge Brown's concurrence on hardship to the Union.
 
 
 61
 While § 2000e(j) refers only to the hardship of the employer, to my way of thinking, the hardship provision was intended to modify the duty to accommodate and would include the hardship of any party subjected to the requirement of accommodation.
 
 
 62
 B. A Union Dues Exemption for Religious Belief.
 
 
 63
 Nowhere in the legislative history of the Equal Employment Act of 1972 is there any indication that Congress intended to amend the provision which now permits an agency shop agreement, and thereby exempt employees who have religious objections to labor organizations from joining or paying a dues equivalence to their representative union. As observed by the Ninth Circuit in Yott v. North American Rockwell Corporation, supra, Congress has repeatedly rejected efforts to provide exceptions to the union security provision of the NLRA for employees who have religious convictions against union membership. 501 F.2d at 400 n. 4. If there had been any understanding by the members of Congress that section 701(j) of the 1972 Act could be used as authority for the EEOC to formulate a guideline which would weaken the union security provision of the NLRA, the Act would most probably have been defeated. Certainly it would not have received such a unanimous approval by both Houses as could be expected only for a noncontroversial provision. Given this history of congressional opposition to amending the union security provision of the NLRA and the unanimous approval of section 701(j), I am unable to conclude that Congress intended to adopt such a provision when it accepted the Randolph Amendment to the Equal Employment Opportunity Act of 1972.[4]
 
 
 64
 Additional evidence that an exception to the union security provision of the NLRA is not to be implied from passage of other statutes can be found in the language of the NLRA, 29 U.S.C. § 158(a)(3) (1970), which reads in part: "Nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein . . .." No attempt is being made to elevate this proviso into a supremacy clause, "which for all time lifts section 8(a)(3) (29 U.S.C. § 158(a)(3)) above the general level of the United States Code to a position comparable to the Constitution," as the majority asserts. (Typed Opinion, p. 169.) Rather, this proviso indicates the strong policy in seeing that all who receive the benefits of union representation must bear a proportional share of the costs,[5] and that exceptions to this policy shall not be found unless clearly or expressly provided. Indeed, in 1974 when Congress extended coverage of the NLRA to employees of nonprofit hospitals, an express provision amending § 8(a)(3) was adopted to exempt "any employee of a health care institution who is a member of and adheres to established and traditional tenets or teachings of a bona fide religion, body, or sect which has historically held conscientious objections to joining or financially supporting labor organizations" from union security agreements. 29 U.S.C. § 169 (1976 Supp.). With deference, I think that the majority is in error when it says (Typed Opinion, p. 169) that this exemption codified at 29 U.S.C. § 169 does not amend § 8(a)(3) of the NLRA. An examination of the legislative history of that Act clearly reveals that the purpose of this provision was to amend § 8(a)(3). See Legislative History of the Coverage of Non-Profit Hospitals Under the National Labor Relations Act, 1974 at 200. (Hereinafter Leg.Hist.)
 
 
 65
 If the 1972 amendment to Title VII does require employers to accommodate the religious beliefs of their employees such as these, there would appear to have been no reason for Congress to have provided the exception found at 29 U.S.C. § 169 when it brought the nonprofit health care industry under the NLRA. The EEOC as amicus curiae advances the argument that Congress meant to require further accommodation to religions beyond that required by Title VII as 29 U.S.C. § 169 provides an absolute exemption which is not overcome by a showing of undue hardship on the part of the Union. The legislative history of the 1974 amendment to the NLRA, however, does not support this contention. In neither the Senate debate, the House debate, nor the Joint Explanatory Statement of the Committee Conference was there any mention made of the 1964 Civil Rights Act as amended or its possible application to situations where employees have religious objections to labor organizations. See Leg.Hist. 193-211, 298-299, 331-336, 348. Obviously then, neither Senator Dominick[6] nor Representative Erlenborn, nor any other member of Congress, believed that Title VII already provided even a possible exemption to the agency shop provision of the NLRA for religious beliefs.
 
 
 66
 In Yott v. North American Rockwell Corporation, supra, the Ninth Circuit was confronted with a case involving a situation similar to the present one. There, the court reversed the dismissal of plaintiff's complaint and remanded to the district court for a determination of whether a reasonable accommodation without undue hardship could be reached. In a footnote, the court described this remand:"Since we hold that if a reasonable accommodation can be reached between the parties it must be offered appellant Yott and such determination is for the District Court on remand (infra ), we leave analysis of whether the 'business necessity' test would be met for the District Court's determination. We are certain that the court will keep in mind that the purpose of a union security clause is to insure that all who receive the benefits of the collective bargaining agreement pay their fair share. 'Free riders' are discouraged. In effect stability is promoted by reducing potential labor strife, thus increasing the efficient operation of the business." 501 F.2d at 402 n. 6.
 
 
 67
 Curiously, the court described the "undue hardship" analysis as a "business necessity" test and went on to suggest to the district court that a union security agreement does meet such a test.[7] I am in basic agreement with this, but conceptualize the issue somewhat differently. To my way of thinking, the "undue hardship" analysis has no application at all to the union security agreement. Briefly stated, I would remand to the district court for the limited purpose of determining whether accommodations such as a transfer of these employees to an open shop can be made without undue hardship; and would direct that in no event should the district court extend the scope of accommodation to provide an exemption from the payment of dues under an agency shop agreement.
 
 
 
 [1]
 Though not next door in Texas, a right-to-work state. Howard Cooper, an original plaintiff, took a nonsuit at trial
 
 
 [2]
 Under which union membership is not a condition of continued employment, but payment to the union of a sum equal to its current dues is
 
 
 [3]
 Appellants continue to work, apparently by tacit agreement of all parties, pending this case
 
 
 [4]
 Having held so much, the district court then evaluated the tenet and concluded that it was irrational and specious, since appellants were not being asked to subscribe to union doctrine or to support strikes or violence against their employer, and since arguably the collective bargaining arrangement promotes industrial peace and thus lessens the possibility of violence. That appellants were producing parts for military aircraft did not escape the court's notice, either. These telling arguments address an issue that is not for federal courts, powerless as we are to evaluate the logic or validity of beliefs found religious and sincerely held. United States v. Seeger, 380 U.S. 163, 184-85, 85 S.Ct. 850, 863, 13 L.Ed.2d 733, 747 (1965)
 
 
 [5]
 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971)
 
 
 [6]
 Riley v. Bendix Corp., 330 F.Supp. 583 (M.D.Fla.1971), rev'd, 464 F.2d 1113 (5th Cir. 1972); see Dawson v. Mizell, 325 F.Supp. 511 (E.D.Va.1971) (action taken under Executive Order 11478)
 
 
 [7]
 Though not all of them. The district court in Dewey found that plaintiffs' rights had been violated, as did the court in Jackson v. Veri Fresh Poultry, Inc., 304 F.Supp. 1276 (E.D.La.1969), a similar case involving Sabbath observance
 
 
 [8]
 Encouraged by the title given by the EEOC to both the original and revised guidelines on the subject: "Observance of Sabbath and religious holidays."
 
 
 [9]
 Unable to improve upon Judge Tuttle's exposition of this history in his Riley opinion for this court, we quote it in full:
 In an amendment to the Civil Rights Act of 1964, approved by the Senate of the United States on March 6, 1972, and by the House of Representatives on March 8, 1972, the following provision was added to Section 701:
 "(7) After subsection (i) insert the following subsection (j):
 (j) The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."
 The total legislative history of this amendment appears at 118 Congressional Record, §§ 227-253. There it appears that Senator Randolph, of West Virginia, who sponsored the amendment, explained that it was designed to resolve the issue left open by the equal division of the Supreme Court of the United States in Dewey v. Reynolds Metals Company, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). At 118 Congressional Record, § 228, Senator Randolph said:
 "I think in the Civil Rights Act we thus intended to protect the same rights in private employment as the Constitution protects in Federal, State or local governments. Unfortunately, the courts have, in a sense, come down on both sides of the issue. The Supreme Court of the United States, in a case involving the observance of the Sabbath and job discrimination, divided evenly on this question.
 This amendment is intended, in good purpose, to resolve by legislation and in a way I think was originally intended by the Civil Rights Act that which the courts apparently have not resolved. I think it is needed not only because court decisions have clouded the matter with some uncertainty; I think this is an appropriate time for the Senate, and hopefully the Congress of the United States, to go back, as it were, to what the Founding Fathers intended. The complexity of our industrial life, the transition of our whole area of employment, of course are matters that were not always understood by those who led our Nation in earlier days."
 It is significant that this measure was passed by a unanimous vote in the Senate.
 The legislative history shows similar approval by the House of Representatives after the Chairman of the House Committee made the following explanation:
 "Section 701(j) This subsection, which is new, defines 'religion' to include all aspects of religious observance, practice and belief, so as to require employers to make reasonable accommodations for employees whose 'religion' may include observances, practices, and beliefs such as sabbath observance, which differ from the employer's or potential employer's requirements regarding standards, schedules, or other business-related employment conditions.
 Failure to make such accommodation would be unlawful unless an employer can demonstrate that he cannot reasonably accommodate such beliefs, practices, or observances without undue hardship on the conduct of his business.
 The purpose of this subsection is to provide the statutory basis for EEOC to formulate guidelines on discrimination because of religion such as those challenged in Dewey v. Reynolds Metals Company, 429 F.2d 325 (324) (6th Cir. 1970). Affirmed by an equally divided court, 402 U.S. 689 (91 S.Ct. 2186, 29 L.Ed.2d 267) (1971). " 118 Congressional Record, pp. 1861-1862.
 Riley v. Bendix Corp., 464 F.2d 1113, 1116-17 (5th Cir. 1972).
 
 
 [10]
 In Yott v. North American Rockwell Corp., 501 F.2d 398 (9th Cir. 1974), the Ninth Circuit reaches a similar conclusion. And our panel in Young v. Southwestern Sav. & Loan Ass'n, 509 F.2d 140 (5 Cir. 1975), necessarily assumed a reach in the Act beyond Sabbatarianism, though the point was apparently not contested there
 
 
 [11]
 "(N)othing in this subchapter, or in any other statute of the United States, shall preclude an employer from making (a union security agreement) . . . ." 29 U.S.C. § 158(a)(3) (1970)
 
 
 [12]
 29 U.S.C. § 169 (Supp. IV 1974)
 
 
 [13]
 It is certainly correct that, as has been noted by our Brothers of the Ninth Circuit, numerous direct efforts to amend the NLRA in such respects have been beaten down. Yott v. North American Rockwell Corp., 501 F.2d 398, 400-01 n.4 (9th Cir. 1974)
 
 
 [14]
 Employer's vice-president and counsel, Booth, explained in testimony why he decided that Employer should employ its own counsel:
 A. Well, we have been talking about the federal enclave here, and it has been made an issue in this litigation; and
 There is more at stake to General Dynamics as a matter of the federal enclave than there is to the local or district lodge of the International Union. We felt that we have a litigation in process in Austin, Texas, in Travis County, in connection with the franchise tax; and
 We had one litigation in the early sixties with reference to the ad valorem tax situation upon our property on the enclave, or the property on the enclave; and
 We felt, as a matter of good business judgment, it prudent, in protection of our own interests, and in connection with the enclave and our problems with the enclave, that we could best do this by retaining our own counsel.
 Q. Do you feel there might possibly be some conflict of interest if the union attorney was solely representing your interests in this case?
 A. We felt that.
 
 
 [15]
 My Brothers also ascertain a duty to accommodate on the part of the union. See e. g., note 1, concurring opinion of Chief Judge Brown, infra. I fully agree with the reasoning of that footnote insofar as it finds in section 703(c)(3) a duty on the union's part not to interfere with an employer's attempt to accommodate under section 701(j). To this extent and in this sense only, the argument is impeccable, but it carries me no further. But it may be that if the majority is resolved to inject the concept of union hardship into section 701(j), it is as well to import also the corresponding duty to accommodate even at the expense of further violence to the statute
 
 
 [1]
 It is perfunctorily asserted that section 701(j) applies only to employers, not to unions. The contention derives such plausibility as it has from the circumstance that the definition of "religion" embodied in that section, quoted at footnote 9 above, contains a reference to accommodation by an employer, but none to accommodation by a union. It must be remembered, however, that the term "religion" is defined for purposes of section 703 of the same Civil Rights Act. That section, in its subsection (c)(3), defines union misconduct in terms of employer misconduct, making it an unlawful employment practice for a union to cause or attempt to cause an employer to discriminate or discharge on grounds of religion. The customary procedure for enforcing agency shop agreements, and that provided for by Article Two, Section 5, of the agreement in effect here between Employer and Union, is discharge of the delinquent employee upon demand of the Union. Thus, for the Union to demand appellants' discharge for delinquency in dues-equivalent payments, when that delinquency is a consequence of their religious belief a belief that Employer has not attempted to accommodate, and that it may yet be found able to accommodate without undue hardship would be to do precisely what section 703(c) (3) denounces. And so, though perhaps backhanded, the application of section 701(j) to the Union and its acts is plain. These two sections when read together impose a duty on the union as well as the employer to accommodate the religious beliefs of employees
 
 
 [1]
 "Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein . . . if such labor organization is the representative of the employees . . .."
 
 
 [2]
 This agency is charged with enforcement of Title VII. 42 U.S.C. § 2000e-4 (1970)
 
 
 [3]
 According to Senator Randolph, this religious group observes the Sabbath beginning at sundown Friday evening and ending at sundown Saturday evening. 118 Cong.Rec. 705 (1972)
 
 
 [4]
 Cf. Morton v. Mancari, 1974, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290. In Mancari, the Supreme Court held that the Equal Employment Opportunity Act of 1972 had not impliedly repealed provisions of The Indian Reorganization Act of 1934 according an employment preference to Indians for jobs in the Bureau of Indian Affairs. Preference for Indians in the BIA was found to be a part of the longstanding national policy on Indians, just as the agency shop provision is a longstanding part of national labor policy. As stated by the Court: "In light of the factors indicating no repeal, we simply cannot conclude that Congress consciously abandoned its policy of furthering Indian self-government when it passed the 1972 amendments." 417 U.S. at 551, 94 S.Ct. at 2483, 41 L.Ed.2d at 301
 
 
 [5]
 See S.Rep.No.105 on S. 1126, 80th Cong., 1st Sess. 7 (1947), quoted in Yott v. North American Rockwell Corporation, supra, at 400
 
 
 [6]
 Senator Dominick sponsored a proposed amendment to the Senate bill which would allow employees of nonprofit hospitals who have religious objections to labor unions to contribute instead to a nonreligious charity. The Senate, however, tabled this amendment, Leg. Hist. 211-212. Interestingly, Senator Javits of New York was the Senator who moved to table this amendment, but was also one of the co-sponsors of the Randolph Amendment to the Equal Employment Opportunity Act of 1972. See 118 Cong.Rec. 705. Senator Javits' outspoken opposition to granting exemptions from union security agreements on religious grounds and his support in 1972 of § 701(j) further indicate that Congress had no intent to provide for such an exception when it passed the Equal Employment Opportunity Act in 1972
 
 
 [7]
 See also 501 F.2d at 400-401 n. 4 ("It is for Congress, which authorized union security clauses, not the judiciary, to carve out exceptions to those clauses")