MAINE HUMAN RIGHTS COMMISSION

v.

LOCAL 1361, UNITED PAPERWORK-
ERS INTERNATIONAL UNION
AFL–CIO et al.

Supreme Judicial Court of Maine.

Feb. 27, 1978.

Goranites & Libby by Gary W. Libby (orally), Portland, for plaintiff.

Robert W. Nixon, Johns & Carson, Washington, D. C., for amicus curiae, General Conference of Seventh-day Adventists.

Preti & Flaherty by John J. Flaherty (orally), Peter H. Rysman, Drummond, Wescott & Woodsum by Harry R. Pringle (orally), Daniel T. Drummond, Portland, for defendant.

Before DUFRESNE, C. J., and POMEROY, DELAHANTY, ARCHIBALD and GODFREY, JJ.

POMEROY, Justice.

In all human relations conflicting interests are bound to arise. If society is to exist in a peaceful and orderly setting such conflicts must be resolved to the end that the most desirable social result may obtain. "Our national commitment is to negotiation, dialogue, compromise and adjustment." *Cooper v. General Dynamics, Convair Aerospace Division, Fort Worth Operation*, 533 F.2d 163, 172 (5th Cir. 1976), (Brown, C. J., specially concurring), *cert. denied sub nom., International Association of Machinists and Aerospace Workers, AFL–CIO v. Hopkins*, 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1091 (1977).

Sometimes it is legislative bodies which treat an issue and attempt to reconcile conflicting interests by statutory enactment. E. g., 39 M.R.S.A. §§ 1 *et seq.* (The Workmen's Compensation Act). In other instances it is left to the courts, without supporting legislative enactments to recognize "interests", to declare upon them in terms of "rights" and to provide methodology for the vindication of such "rights". *E. g., Estate of Berthiaume v. Pratt, M.D.*, Me., 365 A.2d 792 (1976).

More often than not, although the Legislature has addressed an interest and legislated with regard thereto, it becomes necessary for the Court to interpret the statute, that ambiguities resulting from language used in the legislation become authoritatively resolved.

Such is the case here.

Legislative bodies have long since [1] recognized there is a legitimate interest in workers joining together that they might bargain collectively with employers as to terms and conditions of employment. Such legislative bodies have sought to protect this interest by declaring a right to organize and bargain collectively.

Most notable of legislative enactments to this end is the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*

There is no gainsaying citizens have an interest in being protected from persecution because of their particular religious beliefs. Our Legislature has addressed this interest and established such interest as a "right" by proscribing discrimination based upon one's adhering to his particular religious beliefs. Our Maine Legislature has enacted the Maine Human Rights Act, (Maine Act) 5 M.R.S.A. §§ 4551 *et seq.* The declared purpose of such legislation is

> to keep continually in review all practices infringing on the basic human right to a life with dignity, and the causes of such practices, so that corrective measures may, where possible, be promptly recommended and implemented, and to prevent discrimination in employment, housing or access to public accommodations on account of race, color, sex, physical or mental handicap, religion, ancestry or national origin  . . .. 5 M.R.S.A. § 4552.

In the case now before us the interests of a labor union and the interests of Ms. Clarita Michaud regarding discrimination by reason of her religious beliefs and her practices dictated by her religion have come in sharp conflict. It is our responsibility to resolve those conflicts of interest consistent with the intention of the Legislature when it enacted the Maine Act and the intention of the Congress when it enacted the National Labor Relations Act.

The vehicle by which this responsibility became ours is a seasonably filed appeal from a decision of the Oxford County Superior Court denying the Maine Human Rights Commission's (Commission) application for an injunction and dismissing its complaint. Local 1361, United Paperworkers International Union, AFL–CIO (Union) has cross-appealed because of certain con-

---

1. For interesting discussion of history of organized labor's progress in this country, *see, Krystad v. Lau*, 65 Wash.2d 827, 400 P.2d 72 (1965). *See also, Commonwealth v. Hunt*, 45 Mass. (4 Metc.) 111 (1842). As of 1965 12 states and one commonwealth in the United States had enacted comprehensive labor relations statutes.

clusions enunciated by the court in reaching its decision.

We sustain the Commission's appeal and deny the Union's cross-appeal.

Ms. Clarita Michaud was employed by the defendant Oxford Paper Company (Company) as a laboratory technician since November 1970. In 1974 the Union was certified as the exclusive bargaining representative for a unit which included Ms. Michaud's position. Thereafter on June 1, 1975 the Company and the Union entered into a collective bargaining agreement which contained a union security clause obligating all employees in part to pay periodic union dues of $6.00 per month. Upon written request from the Union, the Company was contractually obligated to discharge an employee for nonpayment of the dues.[2]

Ms. Michaud informed the Union that her religious beliefs as a Seventh-day Adventist precluded her from paying the monthly dues. She did, however, indicate to the Union that she would be willing to pay an amount of money equal to union dues to a charitable organization. This proposal was unacceptable to the Union and pursuant to the collective bargaining agreement it requested on July 17, 1975 that the Company discharge Ms. Michaud.

Fearing discharge, Ms. Michaud had filed an administrative complaint with the Maine Human Rights Commission (Maine Commission)[3] on June 17, 1975, in which she alleged employment discrimination based on her religious beliefs. An investigator from the Commission's staff made a preliminary inquiry into the merits of the allegations and recommended that the Commission find reasonable ground to believe that unlawful discrimination had occurred. On July 16, 1975, the Commission unanimously made such a finding and further found that Ms. Michaud's imminent termination would constitute an emergency situation if relief were not immediately granted. On August 1, 1975, the plaintiff Commission filed a complaint in Oxford County Superior Court against the Company and the Union seeking damages and declaratory and permanent injunctive relief on behalf of Ms. Michaud. At the same time it filed an application for a preliminary injunction, seeking to enjoin the defendants from terminating Ms. Michaud's employment status for failure to pay her union dues. On September 15, 1975 a hearing was held on the request for the preliminary injunction. The Superi-

---

**2.** The parties agree and the record clearly indicates that the collective bargaining agreement contains an "agency shop" provision, under which an employee was not required to join the Union, but was obligated to pay to the Union an initiation fee and periodic dues. In pertinent part, the Union Security Agreement reads:

"All employees of the Company presently covered by the Agreement shall on the thirtieth (30th) day hereafter become and remain members of the Union in good standing as to the payment of initiation fees and periodic dues . . . . The Company agrees to discharge, upon written request from the Union, any employee who does not tender to the Union the uniform initiation fees and/or periodic dues." *See generally, Churchill v. S. A. D. # 49 Teachers Association*, Me., 380 A.2d 186 (1977) for a discussion of an "agency shop" provision under the Municipal Public Employees Labor Relations Law, 26 M.R.S.A. §§ 961 *et seq.*

**3.** We note 42 U.S.C. § 2000e–5 contains "deferral" clauses. Subsection (c) provides in part:

In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (b) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. Subsection (d) provides for other deferral provisions to enable a state civil rights commission "a reasonable time . . . *to act under such State or local law to remedy the practice alleged.*" (emphasis supplied). As will be explained hereafter, the Maine Act in all material respects tracks the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Thus, as a practical matter, the result which we reach today under state law would also have occurred if the suit had sought to vindicate a violation of federal law.

or Court issued an order on December 3, 1975 in favor of the Union. The Court did, however, temporarily enjoin the Company from discharging Ms. Michaud until it could be determined whether the Company could accommodate her religious beliefs by transferring her to a non-union position. At a further hearing on March 19, 1976, the parties stipulated that there was no other position within the Company to which Ms. Michaud could be transferred. At the conclusion of this hearing the presiding Justice dismissed both the Commission's application for a preliminary injunction and its complaint.[4] From this final judgment the Commission has appealed and the Union cross-appealed. The General Conference of Seventh-day Adventists was granted leave to file an *amicus curiae* brief.

### I.

The Maine Act declares that

[i]t shall be unlawful employment discrimination, in violation of this Act, except where based on a bona fide occupational qualification:

. . . . .

C. For any labor organization . . to cause or attempt to cause an employer to discriminate against an individual in violation of this section . . . . 5 M.R.S.A. § 4572(1)(C).

The Union asserts on cross-appeal that this provision is inapplicable to the case at bar, for the Maine Act prohibits only religiously motivated discrimination. Here, however, the Union security provision was applied to all persons in the bargaining unit uniformly, and Ms. Michaud was terminated because she did not pay her union dues, not because of her religion the Union says.

The Union is not unaware of the seminal United States Supreme Court decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) in which the Court squarely rejected this type of argument in construing Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Federal Act). Writing for a unanimous Court, Mr. Chief Justice Burger stated that "Congress directed the thrust of the [Federal] Act to the *consequences* of employment practices, not simply the motivation." *Id.* at 432, 91 S.Ct. at 854. (emphasis in original). The Court found that "[t]he [Federal] Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Id.* at 431, 91 S.Ct. at 853.[5]

The legislative history of the Maine Act indicates that it was meant to have very broad coverage. Governor Curtis in addressing the first meeting of the Task Force on Human Rights, the commission appointed to draft the Maine Act, set forth a broad mandate. He urged the group to

search our statutes and our conscience to see that our society at least imposes no legal impediments to each citizen's full exercise of the rights of all citizens. Governor's Task Force on Human Rights, App., A–1.

In particular, the Governor asked the Task Force to "consider what possibilities exist for state law to supplement federal legislation or extend its coverage in the area of fair employment practices." *Id.* In submitting the proposed legislation, the Task Force stressed the salutary goals that they envisioned when drafting the Maine Act.

We should take the lead not only in solving our own problems, whether of social conscience or political history, but also we

---

4. Pending the outcome of this appeal, Ms. Michaud was permitted to continue her employment with the Company. Her position was subsequently eliminated by the Company pursuant to a general staff reduction. Although the necessity for injunctive relief may be a mooted issue, the appellant has also requested statutory civil penal damages pursuant to 5 M.R.S.A. § 4613(2)(B)(7), which is unaffected by Ms. Michaud's layoff. *E. g. Shapiro Bros.*

*Shoe Co. v. Lewiston-Auburn Shoeworkers Protective Ass'n*, Me., 320 A.2d 247 (1974).

5. *Griggs v. Duke Power Co., supra*, dealt with racial discrimination. Nevertheless, the federal courts have uniformly applied the *Griggs* "consequences" test to other types of prohibited discrimination including religious discrimination. *Reid v. Memphis Publishing Co.*, 468 F.2d 346 (6th Cir. 1972).

should take the lead in the nation by showing the way in these areas. *Id.* at 16.

The spirited debate which occurred in the regular and special sessions of the 104th Legislature and the regular session of the 105th Legislature often centered on whether or not the legislation was necessary, given the already existing Federal Act. Supporters viewed the Maine Act as the state equivalent of the Federal Act. Rep. McTeague, the bill's sponsor, stated that one of the purposes of the bill was to bring Maine "in compliance with the federal law . . . ." 3 Leg. Rec. 3934 (1969).[6] Opponents felt that the costs associated with the Maine Act could not be justified since the Maine Act was merely duplicative of the Federal Act. As one opponent stated:

> [I]n addition to the laws which we have right now on the books there are also federal laws and a Federal Civil Rights Commission, and I firmly believe that if somebody was seriously being discriminated against, they would be adequately taken care of by the federal people . . . 3 Leg. Rec. 753–54 (1970). *See* 3 Leg. Rec. 442, 445 (1970); 2 Leg. Rec. 2440–41 (1971).

Although the Maine Act as finally passed was different in some respects from that proposed by the Task Force, the core provisions of the proposed Act relating to employment discrimination were left substantially intact.

During the debates it was noted that the Maine Act was patterned after the Federal Act. 3 Leg. Rec. 4195 (1969). Indeed, a brief perusal of the two statutes reveals striking structural and linguistic similarities in the treatment of employment discrimination.

Both acts in similar terms declare it an unlawful employment practice for an employer to discharge an employee on the basis of that person's race, color, sex, religion, or country of ancestral origin.[7] Both have similar definitions of unlawful employment practices for labor organizations [8] and employment agencies.[9] Both have an exception to the prohibition against discrimination. The Federal Act declares it permissible to hire on the basis of religion, sex, or national origin in those instances where those factors are a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . ." [10] The Maine Act also speaks of a "bona fide occupational qualification," [11] but it nowhere defines that term. Both statutes establish a commission to investigate allegations of discrimination presented to it by written complaint.[12] Both provide that if the respective commission finds reasonable grounds to believe that an unlawful employment practice has occurred, it shall, except where prompt judicial action is necessary, first endeavor to eliminate such discrimination by conference, conciliation and persuasion.[13] If conciliation efforts are un-

---

6. One proponent stated:
   I think we have an opportunity in Maine to learn by the experience of other states by providing a panel for the conciliation and adjustment, and hopefully the solution of the question of illegal—*and it is illegal, make no mistake about it, under our law and the federal law—illegal discrimination on account of race or creed.* 3 Leg. Rec. 3974 (1969) (emphasis supplied).
   Another supporter noted that the Maine Act went further than the federal legislation since unlike the Federal Act it applied to all employers. 3 Leg. Rec. 4318 (1969).

7. 5 M.R.S.A. § 4572(1)(A); 42 U.S.C. § 2000e–2(a)(1). The Maine Act as originally enacted also outlawed employment discrimination on the basis of age. As amended, coverage under the employment discrimination provisions of

the Maine Act extends to physical and mental handicap.

8. 5 M.R.S.A. § 4572(1)(C); 42 U.S.C. § 2000e–2(c).

9. 5 M.R.S.A. § 4572(1)(B); 42 U.S.C. § 2000e–2(b).

10. 42 U.S.C.A. § 2000e–2(e).

11. 5 M.R.S.A. § 4572(1).

12. 5 M.R.S.A. §§ 4561 *et seq.*; 42 U.S.C. §§ 2000e–4(b) *et seq.*

13. 5 M.R.S.A. § 4612(3); 42 U.S.C. § 2000e–5(b).

successful, both commissions are authorized to file a civil action against the named party.[14] Under neither act is the aggrieved party bound by the commission's adverse determination, for an individual can file suit himself.[15]

■ Our examination of the legislative history and statutory structure of the Maine Act inescapably compels but one conclusion: the employment discrimination provisions in our statute were intended to be the state counterparts of the Federal Act, complimenting and in certain instances supplementing the federal. In such circumstances, decisions by federal courts interpreting the federal statutory equivalents of the Maine Act provide significant guidance in the construction of our statute. *Cf. Wormelle v. George*, Me., 325 A.2d 4, 5–6 n.3 (1974); *Wing v. Morse*, Me., 300 A.2d 491 (1973).

Moreover, where the Federal Act is silent as in a definition of "discrimination", the Maine Act speaks in broad terms, defining "discrimination" as *"without limitation, segregate or separate."* 5 M.R.S.A. § 4553(2) (emphasis supplied).

■ In short, we find nothing in the Maine Act which suggests that the Legislature intended it to apply to the limited situation, typically devoid of proof, that an

employer or labor organization intends to discriminate. As in *Griggs v. Duke Power Co., supra,* the touchstone of our statutory prohibition is whether in fact the disputed practice results in unlawful employment discrimination.[16]

■ Defined in this manner, the Union's argument that it did not discriminate against Ms. Michaud is simply without merit. The presiding Justice found, and no one disputes, that Ms. Michaud's religious beliefs are sincere and earnest.[17] Her religious beliefs, as a Seventh-day Adventist prevented her from joining or financially supporting the Union. She was threatened with discharge because she would not meet her financial obligations to the Union. The combined effect of the Union and Company's conduct was to discriminate against Ms. Michaud in violation of 5 M.R.S.A. § 4572.

## II.

Having in effect made this determination, the presiding Justice proceeded to examine pertinent guidelines promulgated by the Maine Commission.

Section 3.05 of the Employment Guidelines of the Maine Human Rights Commission (section 3.05) which defines religious discrimination and provides an affirmative defense states:

---

**14.** 5 M.R.S.A. § 4612(4); 42 U.S.C. § 2000e–5(f)(1).

**15.** 5 M.R.S.A. § 4621; 42 U.S.C. § 2000e–5(f)(1).
In this respect the Maine Act appears to be more liberal than the Federal Act. Under the Maine Act, an aggrieved individual could bring suit in Superior Court without first filing with the Commission, although the Maine Act encourages resort to the administrative machinery by providing that if an individual does not invoke his administrative remedies he will typically forfeit the possibility of an early hearing, attorney's fees, and exemplary damages. 5 M.R.S.A. § 4622. Under the Federal Act charges must be filed with the Equal Employment Opportunities Commission (Federal Commission) before bringing suit. *EEOC v. Mac-Millan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974).

**16.** Our research has revealed no state which requires proof of intent to discriminate for a violation of a state civil rights statute. For

other state courts which have adopted the Griggs "consequences" test, see *N. Inyo Hosp. v. Fair Employment Practice Commission*, 38 Cal.App.3d 14, 112 Cal.Rptr. 872 (1974); *Evening Sentinel v. Nat'l Org'n For Women*, 168 Conn. 26, 357 A.2d 498 (1975); *City of Cairo v. Fair Employment Practices Commission*, 21 Ill. App.3d 358, 315 N.E.2d 344 (1974); *Stephens v. Unified School Dist. No. 500*, 218 Kan. 220, 546 P.2d 197 (1975); *Bhd. of Ry. and S.S. Clerks, Freight Handlers, Express and Station Employees, Lodge 364 v. State*, 303 Minn. 178, 229 N.W.2d 3 (1975); *Physicians Mut. Ins. Co. v. Duffy*, 191 Neb. 233, 214 N.W.2d 471 (1974); *Sontag v. Bronstein*, 33 N.Y.2d 197, 351 N.Y. S.2d 389, 306 N.E.2d 405 (1973); *Wis. Tel. Co. v. Dep't. of Indus., Labor & Human Relations*, 68 Wis.2d 345, 228 N.W.2d 649 (1975).

**17.** The sincerity of the individual's religious beliefs is a proper subject of inquiry at the trial level. *Cooper v. General Dynamics, supra.*

*The duty not to discriminate on religious grounds includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship to the conduct of the employer's business.* Because of the particularly sensitive nature of refusing to hire or discharging an individual on account of his religious beliefs, the burden of proof that the accommodations required by the individual's religious needs impose an undue hardship to the conduct of the employer's business, is on the employer. (emphasis supplied).

■ On cross-appeal the Union attacks the validity of section 3.05. Before considering the Union's argument we face a threshold issue of whether the Union has standing to challenge the guideline, for on its face the administrative interpretation applies only to an employer and not to a labor organization. *See Walsh v. City of Brewer,* Me., 315 A.2d 200 (1974).

Section 3.05 is a virtual carbon copy of the Federal Commission's regulation 29 C.F.R. § 1605.1 (1967).[18] Without exception, the federal courts have read the term "labor organization" into the federal guideline or the corresponding statutory language. *Cooper v. General Dynamics, supra; Hardison v. Trans World Airlines, Inc.,* 527 F.2d 33 (8th Cir. 1975), *rev'd on other grounds,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *Yott v. North American Rockwell Corp.,* 501 F.2d 398 (9th Cir. 1974); *Anderson v. General Dynamics Convair Aerospace Division,* 430 F.Supp. 418 (S.D. Cal.1977); *Nottelson v. A. O. Smith Corp.,* 423 F.Supp. 1345 (E.D. Wis.1976).

The basic reason for judicially imposing the obligation of reasonable accommodation and the affirmative defense of undue hardship on a labor organization was that in every other respect the Federal Act made no distinction between religious discrimination on the part of an employer and a union. The absence of the term "labor organization" was, therefore, not significant. *Cooper v. General Dynamics, supra; Hardison v. Trans World Airlines, Inc., supra.* Since it appears that the Maine Commission virtually incorporated the entire federal regulation into section 3.05, this omission on the federal level was perpetuated in our own guidelines. The Maine Act, like the Federal Act, draws no distinction between employer and union religious discrimination. Both are equally prohibited. We, therefore, find persuasive Chief Judge Brown's reasoning:

> [R]eason argues overwhelmingly that in the structure of this statute Congress could not have thought that for two parties under the same stringent substantive prohibition one has an escape hatch of undue hardship denied to the other growing out of the common industrial setting. *Cooper v. General Dynamics, supra* at 172.

Having found that the Union has standing to challenge the guideline, we consider its argument that section 3.05 is void for inconsistency with the Maine Act. *Cf. Joyce v. Webber,* 157 Me. 234, 170 A.2d 705 (1961).

The Union first asserts that there is no indication in the Maine Act that a union or an employer must reasonably accommodate

---

**18.** 29 C.F.R. § 1605.1 (1967) provides in pertinent part:

> (b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of an employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for

example, may exist where the employee's needed work cannot be performed by another employee of substantial similar qualifications during the period of absence of the sabbath observer.

> (c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.

another person's religious beliefs to the point of hardship upon that organization.[19]

The federal equivalent of section 3.05, 29 C.F.R. § 1605.1 (1967), underwent critical scrutiny on this very issue in the sixth circuit court of appeals decision of *Dewey v. Reynolds Metals Co.*, 429 F.2d 324 (6th Cir. 1970). There the court stated:

> Nowhere in the legislative history of the Act do we find any Congressional intent to coerce or compel one person to accede to or accommodate the religious beliefs of another. The requirement of accommodation to religious beliefs is contained only in the EEOC Regulations, which in our judgment, are not consistent with the Act. *Id.* at 334.

This decision was subsequently affirmed *per curiam* and without explanation by an equally divided United States Supreme Court.[20] Congress expressed its disapproval of *Dewey* in 1972 by substantially incorporating the guideline into the Federal Act.[21] The legislative history of the amendment, as expressed by its sponsor, reveals that the guideline well captured the original intention of the Federal Act.[22] Thereafter with the exception of the sixth circuit the exact position of which is not clear,[23] the guideline was continuously upheld as a defensible construction of the Federal Act, most recently by the United States Supreme Court, even in those cases which were governed by the Federal Act prior to its amendment.[24]

■ Our Commission is statutorily authorized "[t]o adopt, amend and rescind rules and regulations to effectuate [the Maine]

---

**19.** The Union does not attack the guideline as violative of the establishment clause of the First Amendment which states: "Congress shall make no law respecting an establishment of religion . . . ." U.S.Const. Amend. I. This clause, made applicable to the states through the fourteenth amendment, *Cantwell v. Conn.*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) prohibits the states or federal government from passing laws which aid one religion, aid all religions or prefer one religion over another. *Everson v. Bd. of Educ.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The argument has been made that the federal counterpart of section 3.05, 29 C.F.R. § 1605.1 (1967) violates the establishment clause in granting privileges, *i. e.* an accommodation, to the believer unavailable to the nonbeliever. Although two federal circuit courts have rejected this contention, *Hardison v. Trans World Airlines, Inc., supra; Cummins v. Parker Seal Co.*, 516 F.2d 544 (6th Cir. 1975), *aff'd by an equally divided Court per curiam*, 429 U.S. 65, 97 S.Ct. 342, 50 L.Ed.2d 223 (1976), a federal district court believed otherwise. *Yott v. North American Rockwell Corp.*, 428 F.Supp. 763 (C.D. Cal. 1977).

Similarly, the Commission does not press its constitutional claim that Ms. Michaud's discharge for nonpayment of union dues violates the free exercise clause of the First Amendment which states: "Congress shall make no law . . . prohibiting the free exercise [of religion] . . . ." The argument runs that legislation which permits a collective bargaining provision requiring an employee to either financially support a union or lose his job, when that person's religious beliefs preclude such support, impermissibly infringes on his free exercise of religion. This view has yet to win judicial recognition. *Yott v. N. Am. Rock-*

well Corp., supra; Linscott v. Millers Falls Co., 440 F.2d 14 (1st Cir.), *cert. denied*, 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed.2d 116 (1971); *Gray v. Gulf, Mobile & Ohio R. R. Co.*, 429 F.2d 1064 (5th Cir. 1970), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 461, 27 L.Ed.2d 451 (1971).

**20.** 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). Affirmance by an equally divided Court establishes no precedent. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

**21.** Civil Rights Act of 1964, § 701(j), as amended, 42 U.S.C. § 2000e(j) provides:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

**22.** For a complete review of the legislative history of the 1972 amendment, *see Riley v. Bendix Corp.*, 464 F.2d 1113 (5th Cir. 1972).

**23.** Compare *Reid v. Memphis Publishing Co.*, 468 F.2d 346 (6th Cir. 1972) and *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515 (6th Cir. 1976) which approved of the guideline with *Reid v. Memphis Publishing Co.*, 521 F.2d 512 (6th Cir. 1975) which found the guideline inconsistent with the underlying statute.

**24.** *Riley v. Bendix Corp., supra; Hardison v. Trans World Airlines, Inc.*, 527 F.2d 33 (8th Cir. 1975), *rev'd on other grounds*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

Act . . . ." 5 M.R.S.A. § 4566(7). Pursuant to this authorization the Commission promulgated its Employment Guidelines, correctly recognizing that

> consistent with the public policy underlying the Act (as expressed in § 4552), and with firmly established principles for the interpretation of such humanitarian legislation, the remedial provisions of the Act shall be given a broad construction and its exceptions shall be construed narrowly. § 3.01(c)(1) Employment Guidelines of the Maine Human Rights Commission.

*Cf. Rogers v. Equal Employment Opportunity Commission,* 454 F.2d 234 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). Administrative interpretations by our Commission, as with the Federal Commission, are entitled to great deference, *Griggs v. Duke Power Co.,* supra, especially where that interpretation involves a reasonably "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 512 (1933).

■ Section 3.05 is a reasonable construction of the Maine Act. The Union complains that there is no statutory indication that the Legislature intended an employer or labor organization to accommodate an individual's religious beliefs to the point of hardship. On the contrary, in the absence of a bona fide occupational qualification, any discharge based upon religion would be a violation of the Act. One of the purposes of section 3.05 is to breathe flexibility into an otherwise airtight prohibition against religious discrimination, by providing that a reasonable accommodation need not be made if it would amount to undue hardship. We find nothing unreasonable in such an interpretation.

■ The Union also alleges that the guideline provides a shifting of the burden of proof to the defendant to show undue hardship upon the mere allegation of employment discrimination in contravention of 5 M.R.S.A. § 4631 which provides that "the burden shall be on the person seeking relief to prove, by a fair preponderance of the evidence, that the alleged unlawful discrimination occurred." We disagree. The initial step in determining whether a reasonable accommodation is necessary is a showing by the aggrieved individual of a prima facie case of religious discrimination. Once established, the burden of proof is then upon the defendant to show that there is no reasonable accommodation or that such accommodations can only be made at the price of undue hardship. *Young v. Southwestern Savings and Loan Ass'n,* 509 F.2d 140 (5th Cir. 1975); *Jordan v. North Carolina National Bank,* 399 F.Supp. 172 (W.D.N.C. 1975); *Shaffield v. Northrop Worldwide Aircraft Services, Inc.,* 373 F.Supp. 937 (M.D. Ala.1974).

### III.

On appeal the Commission alleges insufficient evidence to support the Superior Court's finding that no reasonable accommodation could be made to Ms. Michaud's religious beliefs without undue hardship to the Union. The sufficiency of the evidence supporting a judgment for the Company on the ground that it could make no reasonable accommodation to Ms. Michaud is not before us.[25]

Without any supporting testimony or evidence, the presiding Justice appeared to rule as a matter of law that an exemption from Union dues would be an undue hardship upon the Union, notwithstanding her offer to pay an equivalent sum to charity.[26]

---

**25.** As explained earlier, the Company was temporarily enjoined from discharging Ms. Michaud pending a determination of whether she could be transferred to a comparable non-union position. After reviewing all such possibilities, the Company concluded that no comparable position existed. Both the Union and the Commission stipulated to this determination.

**26.** The Superior Court stated:

Accordingly, this Court, although finding that Ms. Michaud's religious beliefs are sincere

This ruling disregards a basic tenant of our guidelines which provides:

> Resolution of such cases depends on *specific factual circumstances* and involves a delicate balancing of an applicant or employee's religious needs with the degree of disruption imposed on the employer's business operation. (emphasis supplied)

Section 3.05, Employment Guidelines of the Maine Human Rights Commission. Thus although such conclusion may be warranted following an evidentiary hearing, the judgment cannot be reached without an analysis of the specific factual circumstances which were involved.

In finding that an exemption from the Union dues requirement would be an undue hardship as a matter of law, the Court relied upon section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3).[27]

■ Two distinct but interrelated problems potentially arise between our construction of the Maine Act and section 8(a)(3) and other provisions of the National Labor Relations Act, 29 U.S.C. §§ 151 *et. seq.*:

1. Whether a direct conflict exists between the two statutes, and
2. Whether notwithstanding the absence of a direct conflict the National Labor Relations Act has preempted the Commission's state court action.

We have concluded that there is neither a problem of conflict nor preemption that would preclude the relief here sought. *Accord, Bald v. R.C.A. Alascom*, 569 P.2d 1328 (Alaska 1977) (suit under Alaska Civil Rights statute presenting same fact pattern as the one presently under review).

We find no repugnance or conflict so direct and positive that the two statutes cannot be reconciled or consistently stand together. *Kelly v. Washington ex rel. Foss Co.*, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937). Section 8(a)(3) on its face does not mandate union security agreements; it merely provides "[t]hat nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making [a union security] agreement with a labor organization . . . ."

As *Cooper v. General Dynamics, supra* at 170, observes:

> [An employer] and his union can make any [union security agreement] they like and enforce it in the general run of cases—in all except the unusual one where compliance would run counter to a particular employee's religious conviction, sincerely held, that can be accommodated without undue hardship.

■ Moreover, an exemption from the union dues requirement contingent upon payment of an equivalent sum to charity would not substantially undermine the purpose behind a union security clause. Although payment to charity would not directly compensate a union for its services, it does prevent an employee from becoming a "free rider" in the sense of benefitting as a result of union activity on his behalf without paying anything at all. *International Association of Machinists v. Street*, 367 U.S. 740, 763 n.14, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).[28]

· · · · ·

and earnest, finds that if she is to remain in her present position, she must contribute her share of the collective bargaining costs to the union. She has benefitted and will continue *to benefit from the Union efforts* at the bargaining table. Her offer to pay an amount equal to union dues to a nonreligious charity, while indicative of her sincerity, cannot compensate the Union for their efforts in bargaining for the unit of which she is a part. *This Court in effect finds that it would be an undue hardship for the Union to exempt Ms. Michaud from the payment of her dues.* (emphasis supplied).

27. Section 8(a)(3) states in pertinent part:
It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making [a union security] agreement with a labor organization . . . .* (emphasis supplied).

28. Even if we were to find a conflict between the two provisions, Section 8(a)(3) is circumscribed by Section 14(b) of the National Labor Relations Act, 29 U.S.C. § 164(b) which makes an agency shop provision give way before a

Nor is a suit under the Maine Act preempted by the enactment of a comprehensive national labor law. In the landmark opinion of *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the United States Supreme Court held

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. *Id.* at 244, 79 S.Ct. at 779.

■ Here, however, the Union conduct in seeking a discharge for failure to pay state law prohibiting it. *Retail Clerks Int'l Ass'n., Local 1625, AFL–CIO v. Schermerhorn*, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). Thus, in *Churchill v. S.A.D. # 49 Teachers Ass'n, supra*, we found that the Municipal Public Employees Labor Relations Law, 26 M.R.S.A. §§ 961–972 prohibited an agency shop provision in a collective bargaining agreement between public employees and their public employer.

**29.** Section 8(b)(2) makes it an unfair labor practice for a union:

> [T]o cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated *on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership* . . . . (emphasis supplied).

**30.** To the extent, however, that this suit "arguably" falls within the prohibition of section 8 of the National Labor Relations Act, *see Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), an exemption within *Garmon* makes this a permissible state court action.

> [W]here the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act. 359 U.S. at 244, 79 S.Ct. at 779.

*Accord, Bald v. R.C.A. Alascom, supra.*

union dues is not an unfair labor practice.[29] As such *Garmon* is inapplicable.[30]

■ The presiding Justice also relied upon the federal district court opinion in *Cooper v. General Dynamics*, 378 F.Supp. 1258 (N.D.Tex.1974), which was subsequently reversed by the fifth circuit court of appeals, 533 F.2d 163 (5th Cir. 1976).[31] In a factual situation directly on all fours with the one at bar, a divided court found that reasonable accommodations to the religious needs of a Seventh-day Adventist included the possibility of payment to a charity of a sum equal to the employee's union dues unless this would amount to undue hardship to the conduct of the employer's business or to the union. For reasons stated at length in this opinion we agree with *Cooper*.[32]

**31.** *Cooper* was decided by the 5th circuit *after* the Court below acted in this case.

**32.** For other cases presenting the identical factual situation and in which the court found that a reasonable accommodation included the possibility of an exemption from the union dues requirement, *see Yott v. North American Rockwell Corp., supra*, (court, however, expressed its reservations whether a reasonable accommodation could be reached); *Nottelson v. A. O. Smith Corp., supra*, (defendants' motion to dismiss denied). *See also EEOC Decision No. 74–107, CCH EEOC Decisions* ¶ 6430 (1974). *But see Anderson v. General Dynamics*, 430 F.Supp. 418, 422 (S.D.Cal.1977) where the court held that "anything less than payment of the equivalent of dues to the Union for charitable purposes would impose an undue hardship on the Union."

These cases are all readily distinguishable from the recent United States Supreme Court opinion in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) which held that an employer need not violate the provisions of a valid seniority system to accommodate the religious needs of an employee whose religion required him to observe his Sabbath day on Saturday and was discharged when he refused to work on that day. The Court found that to relieve the plaintiff of his Saturday shift would deprive another employee, with greater seniority, of his shift preference simply because that employee did not observe a Saturday Sabbath. According to the Court, the Federal Act did not contemplate such unequal treatment on the basis of religion. *Id.* at 80, 97 S.Ct. at 2275, 53 L.Ed.2d at 129. In the case at bar if Ms. Michaud were granted the accommodation which she is seeking there would be neither a greater burden on her fellow employees nor unequal treatment, for all would

On remand the Superior Court should hear testimony and take evidence on whether the Union and the Company without undue hardship can accommodate the religious beliefs of Ms. Michaud by permitting her to pay to a nonreligious charity an equivalent sum of union dues. Among the factors that the Court should consider in determining whether to exempt Ms. Michaud is the financial burden to the Union that would result from the loss of her union dues. To require the Union to bear more than a de minimis extra cost would be an undue hardship on the Union. *Trans World Airlines, Inc. v. Hardison, supra.* In addition, the Court should consider the impact on the morale of the Union members from any such exemption. Although mere grumbling will not suffice, *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515 (6th Cir. 1976), any adverse effect on Union solidarity should be carefully scrutinized.

We, therefore, sustain the Commission's appeal and remand the case to the Superior Court for an evidentiary hearing on whether the Union and Company can accommodate the religious beliefs of Ms. Michaud by allowing her to pay an equivalent sum of union dues to a nonreligious charity without undue hardship on either the Company or the Union.

The entry is:

Appeal sustained; case remanded to the Superior Court for further proceedings in accordance with the opinion herein.

Cross-appeal denied.

DUFRESNE, A. R. J., and DELAHANTY, J., concurring.

ARCHIBALD and GODFREY, JJ., dissenting.

WERNICK, J., did not sit.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice, but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.

GODFREY, Justice, with whom ARCHIBALD, Justice, concurs, dissenting:

I concur in Parts I and II of the majority opinion but not in Part III. Although the union security clause does not directly discriminate on the basis of religion, it does have discriminatory impact on the exercise of at least one religious practice. The Maine civil rights statute can be fairly construed to require employers and unions to take steps to accommodate the free exercise of religion as long as the accommodation does not amount to an undue burden on the union and employer. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

In reaching its decision, the Superior Court inquired into possible accommodations, including transfer of the employee out of the bargaining unit and payment by her to a charity of an amount equal to union dues. The court found that transfer was not possible and that the payment to charity would impose an "undue burden." The majority opinion suggesting remand for a more detailed hearing on the charitable gift accommodation would leave the question of enforceability of union security

be paying the same amount of money. The Supreme Court further found that a seniority system is itself a reasonable accommodation to the religious needs of the employees, for within the confines of the seniority system, an employee was free to choose when he would not work. *Id.* at 77, 97 S.Ct. at 2273, 53 L.Ed.2d at 127. In the present case the union security provision presents no such flexibility. The Court also went to great lengths to point out the various attempts the employer had made to accommodate the religious needs of the plaintiff. *Id.* The record in the case before us shows no accommodation attempts made by

the Union. Finally, the Court relied upon the special treatment afforded seniority systems within the Federal Act itself. *Id.* at 82, 97 S.Ct. at 2275, 53 L.Ed.2d at 129. Under the statute the uniform application of a bona fide seniority provision is not unlawful even if it results in discriminatory consequences. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Int'l Brhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In the case at bar, these special considerations are not present.

agreements open for case-by-case determination. Under that approach, trial courts will evaluate the cost to each union and the impact on union solidarity in each case. Trial courts will have to ascertain the number of Seventh-day Adventists and other religious objectors in the bargaining unit. Inquiry will have to be made into the morale of each local union. Employers and unions will have great difficulty operating under such conditions of uncertainty. The permissible scope of mandatory union security agreements should be determined as a matter of law. In that way, needless hearings and uncertainty will be avoided.

The federal government has long recognized the importance of collective bargaining. Since 1935, the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, has provided detailed procedures for selection of bargaining agents and for collective bargaining. Furthermore, the union security agreement involved in this case is of a kind expressly approved by section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3). The National Labor Relations Act represents the national commitment to collective bargaining and the maintenance of unions as bargaining agents.

As elected bargaining agents, unions provide benefits to all members of the bargaining unit. They bargain for greater compensation and improved working conditions. Many unions also provide elaborate grievance procedures. Unions fulfilling those functions are duty-bound to represent all unit employees. *Steele v. Louisville & Nashville R. R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). The advantages achieved by the union are incorporated into the bargaining agreement, which affects all members of the unit. In providing those services the union necessarily incurs substantial expenses. Security agreements are devices that can insure a reliable, constant source of funds with which to defray those expenses. In addition, union personnel are released from fund-raising responsibilities so that they can devote greater energy toward servicing the unit. Since the union acts as the elected representative of all members of the unit and bargains for bene-

fits for all employees, it has concluded reasonably that all members of the unit should share the cost of representation. Union security agreements serve a vital and legitimate function in the National Labor Relations Act system for collective bargaining.

Under 5 M.R.S.A. § 4572 (Supp.1977), employers and unions must make reasonable accommodations of religious practice, but they need not make accommodations which create an undue burden. The security agreement in this case does not require all employees to join the union. Thus, no forced display of loyalty is required of religious objectors. The agreement merely requires that they pay to the union a sum equivalent to union dues. The agreement operates, like a tax, to assure that all members of the unit bear their fair share of the cost of union representation. Contribution of an amount equal to union dues to charity in no way compensates the union for services it provides. It merely requires other members of the unit to bear the cost of benefits bestowed on the religious objectors. I think the proposed accommodation imposes an undue burden as a matter of law.

This position is supported by the case law dealing with the problem of conflicts between collective bargaining agreements and religious practices. Although the Seventh-day Adventists have used in other cases the mechanism of offering to give money to charity, none of the cases relied on in the majority opinion hold that such a proposal is an accommodation which does not impose an undue burden on the union and employer. In *Cooper v. General Dynamics*, 533 F.2d 163 (5th Cir. 1976), *cert. denied, sub nom. International Association of Machinists v. Hopkins*, 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1091 (1977), a divided panel suggested that such an accommodation might not amount to an undue burden. This suggestion was made without reasoned examination of the importance of union security agreements and in the face of a well-reasoned concurrence which explored the problem and concluded that the proposed accommodation was not satisfactory.

In *Nottelson v. A. O. Smith Corp.*, 423 F.Supp. 1345 (E.D.Wis.1976), the court noted the possibility of the accommodation suggested in *Cooper*, again without examination of the role of union security agreements. On the other hand, in *Anderson v. General Dynamics*, 430 F.Supp. 418 (S.D. Cal.1977), the court examined the federally recognized role of union security agreements and held that the accommodation of giving an amount equal to union dues to charity imposes an undue burden on the union. Again, in *Yott v. North American Rockwell Corp.*, 428 F.Supp. 763 (C.D.Cal. 1977), the proposed accommodation was rejected based on the reasoned analysis in *Yott v. North American Rockwell Corp.*, 501 F.2d 398 (9th Cir. 1974). Thus, although the accommodation of making a gift to charity has not always been summarily rejected, it also has not been found to be less than an undue burden. The cases which have examined the idea thoughtfully have rejected it.

In *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the Supreme Court dealt with a substantially similar accommodation problem. In that case, the Court noted that the union seniority system represented an effort to accommodate the needs of all employees and held that to require an exception to the seniority system would burden other members of the unit. The Court noted, at page 79, 97 S.Ct. at page 2274:

> "Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy, and seniority provisions are universally included in these contracts. Without a clear and express indication from Congress, we cannot agree with Hardison and the EEOC that an agreed-upon seniority system must give way when necessary to accommodate religious observances."

The Court concluded that any accommodation overriding the seniority arrangement would burden other employees and would constitute an undue burden. The Court also said:

> "To require TWA to bear more than a de minimis cost in order to give Hardison Saturdays off is an undue hardship." 432 U.S. at 84, 97 S.Ct. at 2277.

Union security agreements to cover bargaining costs are similar in importance and function to seniority provisions. Thus, under the Supreme Court's interpretation of undue burden, imposing an exception to such union security agreements imposes an undue burden. Furthermore, to force the union to forego the $72 annual fee would be to impose more than a de minimis cost.

The appeal should be denied and the judgment of the Superior Court affirmed.