STATE OF MAINE                                    SUPERIOR COURT
ANDROSCOGGIN, ss.                                 CIVIL ACTION
                                                  DOCKET NO. CV-19-10

AUG 30 '21 PM2:14
ANDRO SUPERIOR COUR

HELEN CRABTREE,

     Plaintiff

     v.                                          ORDER ON OUTSTANDING
                                                  MOTIONS
CENTRAL MAINE MEDICAL
CENTER,

     Defendant

There are two pending motions before the court. One is Defendant Central Maine

Medical Center's ("CMMC") dual motion to enforce a settlement agreement and motion for

summary judgment. The other is Plaintiff Helen Crabtree's motion for partial summary

judgment. For the following reasons, both motions will be denied.

Factual Background

Ms. Crabtree is a Seventh Day Adventist. (Pl.'s Add. S.M.F. ¶ 1.) On August 19, 2015,

Ms. Crabtree applied for a Certified Nursing Assistant ("CNA") trainee position with CMMC in

connection with Central Maine Healthcare Corporation's ("CMH") "Earn While You Learn"

("EWYL") program. (Def.'s Supp.'g S.M.F. ¶ 1; Pl.'s Add. S.M.F. ¶ 25.) The EWYL program

is an arrangement whereby CMH would pay tuition and fees for the Maine College of Health

Professionals ("MCHP") CNA training course and would compensate CNA trainees $10.20 per

hour while they worked part-time at CMMC. (*Id.* ¶ 6.) Successful applicants to MCHP could

apply to participate in the EWYL program. (*Id.* ¶ 18.)

Ms. Crabtree had two interviews with CMMC after applying to the EWYL program. (*Id.*

¶ 26.) At some point during these interviews, Ms. Crabtree informed CMMC that, as a Seventh

1

Day Adventist, she observes the Sabbath from sundown Friday to sundown Saturday and would not be available to work during that period. (Def.'s Supp.'g S.M.F. ¶ 9.) CMMC has a weekend schedule protocol that requires CNAs to work a Saturday and Sunday shift every third weekend. (*Id.* ¶ 10.)

One of Ms. Crabtree's points of contact with CMMC during the interview process was Tricia Raymond, nurse manager of CMMC's Med/Surg T1 unit. (*Id.* ¶ 7.) Once Ms. Raymond became aware of Ms. Crabtree's religious conflict with Saturday shifts, she spoke with one of her unit's coordinators to determine whether they could avoid scheduling Ms. Crabtree for Saturday shifts. (*Id.* ¶ 11.) Ms. Raymond proposed the following accommodation: Ms. Crabtree would not be scheduled for any shifts that conflicted with the Sabbath until the following Spring, at which point, due to a higher need for CNAs, Ms. Crabtree would have to use the hospital's voluntary shift swap procedure to avoid working any Saturday shifts she was assigned. (*Id.* ¶ 12.) Ms. Raymond was under the impression that Ms. Crabtree wished to proceed with a CNA trainee position after their conversation, and recommended that human resources make Ms. Crabtree an offer. (*Id.* ¶ 14; Pl.'s Add. S.M.F. ¶ 31.)

On September 15, 2015, Ms. Dingley, as a representative of CMMC's Human Resources Department, contacted Ms. Crabtree via telephone to make her an offer. (Def.'s Supp.'g S.M.F. ¶ 15.) The parties dispute what was said during this call, but they agree that the issue of weekend scheduling came up. (*Id.* ¶¶ 15-17; Pl.'s Add. S.M.F. ¶¶ 33-41.) Ms. Crabtree avers that Ms. Dingley informed her, for the first time, that she would be responsible to find someone to work her shift if she was scheduled to work on a Saturday. (*Id.* ¶¶ 35-36.) Ms. Crabtree also avers that she told Ms. Dingley that she could not ask another person to work on Saturday because she was unqualified to take on that responsibility and because doing so would violate her religious

2

convictions. (*Id.* ¶ 38.) CMMC denies that Ms. Crabtree stated that she had a religious objection to asking a coworker to cover her Saturday shifts during her call with Ms. Dingley. (Def.'s Opp. to Pl.'s Add. S.M.F. ¶ 38.)

Ms. Dingley suggested that Ms. Crabtree discuss the shift swapping issue with Ms. Raymond to address her concerns. (Def.'s Supp.'g S.M.F. ¶ 17.) Ms. Crabtree declined to do so. (*Id.* ¶ 18.) Ms. Crabtree avers that she declined to have a second conversation with Ms. Raymond because she believed that nothing she could say to Ms. Raymond would change matters. (Pl.'s Add. S.M.F. ¶ 41.) Ms. Dingley called Ms. Crabtree back after conferring with a nurse manager and advised Ms. Crabtree that CMMC would be rescinding the offer of employment. (Pl.'s Add. S.M.F. ¶ 46.; Def.'s Opp. to Pl.'s Add. S.M.F. ¶ 46.) Ms. Crabtree asked Ms. Dingley to rescind the offer in writing, whereupon Ms. Dingley sent Ms. Crabtree an email stating that the offer was rescinded because Ms. Crabtree was not able to commit to the scheduling requirements of the position. (Pl.'s Add. S.M.F. ¶ 47.)

Ms. Crabtree filed a complaint with the Maine Human Rights Commission ("MHRC") alleging religious discrimination against CMMC. This complaint ended in a conciliation agreement signed by Ms. Crabtree, CMMC and the MHRC. (Def.'s Ex. 14.) The conciliation agreement states that Ms. Crabtree and CMMC have reached a private settlement agreement.[1] Ms. Crabtree and CMMC also signed a handwritten "Conciliation Term Sheet," which enumerated certain obligations of the parties:

---

[1] CMMC's statement of material facts includes the following statement:

"The Conciliation Agreement states that the parties had reached a private settlement agreement and that the agreement becomes effective upon signing by all parties." (Def.'s Supp.'g S.M.F. ¶ 77.)

This statement is supported insofar as it means that the conciliation agreement itself becomes effective upon signing by all parties. (Def.'s Ex. 14, at *4.) The conciliation agreement does not contain any express terms which state that the private settlement agreement between Ms. Crabtree and CMMC becomes effective upon signing of the Conciliation Agreement. (Def.'s Ex. 14.)

1. [CMMC] agrees to pay [Ms. Crabtree] [redacted]. [Ms. Crabtree]'s attorney to communicate allocation to [CMMC]'s attorney.

2. [CMMC] agrees to issue letter of apology, drafted by Atty. Messerschmidt and Atty. McFarland, as agreed upon.

3. Both payment and letter are part of a confidential private agreement.

4. Agreements will be listed on [MHRC] agenda of 10/22/18 and check(s) will be mailed to [Ms. Crabtree] following [MHRC]'s approval

(Def.'s Ex. 15.) No other agreements between Ms. Crabtree and CMMC are part of the record on this summary judgment motion.

Procedural Background

Ms. Crabtree filed a complaint alleging employment discrimination in Superior Court on January 18, 2019. Following some discovery, CMMC filed a dual motion to enforce the settlement agreement and motion for summary judgment on November 16, 2020. Ms. Crabtree filed an objection to CMMC's motion on December 21, 2020. CMMC replied to this objection on January 19, 2021.

Ms. Crabtree also filed a motion for partial summary judgment on November 16, 2020. CMMC filed an opposition to the motion on December 21, 2020. Ms. Crabtree filed her reply on January 19, 2021.[2]

---

[2] CMMC filed responses to Ms. Crabtree's denials and qualifications of CMMC's statements of material fact on both motions. CMMC cites M.R. Civ. P. 56(h)(3) as the basis for responding to Ms. Crabtree's denials and qualifications of CMMC's statements of material fact on its own summary judgment motion and cites M.R. Civ. P. 56(i)(2) as the basis for its filing similar responses to Ms. Crabtree's denials and qualifications of CMMC's additional statements of material fact in opposition to Ms. Crabtree's motion for partial summary judgment. Rule 56(h)(3) allows a party moving for summary judgment to respond to the opposing party's additional statements of material fact with admissions, denials or qualifications. Rule 56(i)(2) grants parties the right to file responses to any *objection* an opposing party makes with respect to factual assertions. Neither filing is supported by the rules, so the court will disregard them.

4

Standard

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. City Mortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted).

"Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." M.R. Civ. P. 56(h)(4). In order to controvert an opposing party's factual statement, a party must "support each denial or qualification by a record citation." M.R. Civ. P. 56(h)(2). "Assertion of material facts must be supported by record references to evidence that is of a quality that would be admissible at trial." *HSBC Mortg. Servs. v. Murphy*, 2011 ME 59, ¶ 9, 19 A.3d 815.

Decisions by the federal courts construing provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, provide significant guidance to Maine Courts in the construction of the Maine Human Rights Act ("Maine Act"), 5 M.R.S. §§ 4551 *et. seq. Maine Human Rights Comm'n v. United Paperworkers Int'l Union*, 383 A.2d 369, 375 (Me. 1978). MHRC interpretations of the Maine Act are entitled to great deference. *Id.* at 378.

Discussion

The court must address the following issues:

1.) is there an enforceable settlement agreement discharging Ms. Crabtree's claims against CMMC?

2.) is there a question of material fact as to whether CMMC offered Ms. Crabtree a reasonable accommodation?

5

3.) is there a question of material fact as to whether reasonable accommodation is possible without undue hardship?

4.) is there a question of material fact as to whether punitive damages are available?

5.) is there a question of material fact as to whether substantially equivalent alternative positions were available to Ms. Crabtree?

Settlement Agreement

CMMC argues that the conciliation agreement and terms sheet Ms. Crabtree signed effected a binding release of all claims related to Ms. Crabtree's religious discrimination allegations. Ms. Crabtree argues that the issue is not properly raised because CMMC failed to file a counterclaim seeking to enforce the settlement. Ms. Crabtree also argues that CMMC has failed to establish the existence of a settlement agreement.

"Settlement agreements are analyzed as contracts, and the existence of a binding settlement agreement is a question of fact." *Brochu v. McLeod*, 2016 ME 146, ¶ 36, 148 A.3d 1220. If a contract is unambiguous its interpretation is a matter of law and the court interprets it according to plain meaning of the language used. *Camden Nat'l Bank v. S.S. Navigation Co.*, 2010 ME 29, ¶ 16, 991 A.2d 800. A contract is ambiguous if it is reasonably susceptible to different interpretations. *Id.*

Neither the term sheet nor the conciliation agreement state that Ms. Crabtree has agreed to release her claims against CMMC. Neither document contains an express term stating that Ms. Crabtree agreed to release her claims in exchange for consideration. The term sheet states that the payment and letter referred to therein are "part of a confidential private agreement," but it does not state that this agreement would contain a promise from Ms. Crabtree to release all of her claims against CMMC. (Def.'s Ex. 15.) The conciliation agreement also refers to a private settlement agreement between Ms. Crabtree and CMMC, but that agreement, if it exists, is not in

6

the record. (Def.'s Ex. 14, at * 2.) To the extent that CMMC is inviting the court to read an implied release of all claims into the provisions of the terms sheet and conciliation agreement themselves, the court declines.

It is irrelevant whether the purported settlement agreement is enforceable or properly raised. There is nothing in the record to suggest that Ms. Crabtree agreed to release her claims against CMMC, so the motion to enforce the settlement agreement must be denied.

Reasonable Accommodation

To establish a prima facie case on a claim for religious discrimination, Ms. Crabtree must show:

(1) a bona fide religious practice conflicts with an employment requirement;

(2) she brought the practice to CMMC's attention; and

(3) that the religious practice was the basis for an adverse employment action.

*Sanchez-Rodriguez v. AT&T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 8 (1st Cir. 2012). If Ms. Crabtree establishes a prima facie case of religious discrimination, CMMC must show that it offered a reasonable accommodation or that a reasonable accommodation would be an undue burden. *Id.* CMMC concedes for the purposes of its summary judgment motion that there is an issue of material fact as to whether Ms. Crabtree can establish a prima facie case of religious discrimination. (Def.'s Mot. Summ. J. 8, n.3.)

A reasonable accommodation means simply that the employer makes an exception to allow the plaintiff to engage in her religious practice despite the employer's normal rules to the contrary. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 n.2 (2015). "[A]ny reasonable accommodation by the employer is sufficient to meet its accommodation obligation."[3]

---

[3] MHRC regulations provide that "when there is more than one means of accommodation which would not cause undue hardship, the employer must offer the alternative which least disadvantages the individual with respect to his

7

*Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986). "[C]ases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior." *Rocafort v. IBM Corp.*, 334 F.3d 115, 120 (1st Cir. 2003). When analyzing whether an employer offered a reasonable accommodation, a court should take the totality of the circumstances into account and consider whether the combination of accommodations offered by the employer was reasonable. *Sanchez-Rodriguez*, 673 F.3d at 12.

The accommodation offered in this case is not in dispute. CMMC offered to avoid scheduling Ms. Crabtree for Saturday shifts until the following Spring, at which point she would have to use CMMC's shift swap procedure to find a co-worker willing to substitute for her on Saturdays she was scheduled to work. Ms. Crabtree avers that she told CMMC that she has a religious objection to soliciting a co-worker to replace her. CMMC does not dispute the authenticity of this religious belief for the purpose of this summary judgment motion, but denies that Ms. Crabtree told CMMC that she had this belief during the hiring process. (Def.'s Opp. to Pl.'s Add. S.M.F. ¶ 38.) As such, there is an issue of material fact as to whether CMMC's proposed accommodation was reasonable in light of Ms. Crabtree's stated religious objection to soliciting others to work on Saturdays.

CMMC argues that even if Ms. Crabtree had informed CMMC of a religious objection to finding her own replacement, the accommodation it offered was still reasonable. CMMC argues that Ms. Crabtree would have had sufficient time to get to know her co-workers and figure out how to arrange coverage of her prospective Saturday shifts without violating her religious beliefs. It is unclear how additional time would help Ms. Crabtree to arrange coverage for herself in a manner that did not constitute soliciting others to work on the Sabbath, and therefore violate

or her employment or union opportunities." 94-348 C.M.R. ch. 3, § 14(2)(B)(2)(b) (2014). This issue has not been raised, as Ms. Crabtree is arguing that no reasonable accommodation was offered.

her religious beliefs. However, even assuming Ms. Crabtree could hypothetically avail herself of CMMC's shift-swapping procedure without violating her religious beliefs, this hypothetical possibility still leaves an issue of material fact as to whether she could have done so in this case.

There is an issue of material fact as to whether CMMC offered an accommodation that would allow Ms. Crabtree to continue "to engage in her religious practice despite the employer's normal rules to the contrary." *Abercrombie & Fitch*, 135 S. Ct. at 2032 n.2. The fact that Ms. Crabtree had time before she would need to avail herself of CMMC's shift-swapping procedure does not entitle CMMC to judgment as a matter of law. *See Tabura v. Kellogg USA*, 880 F.3d 544, 550 (10th Cir. 2018) (an accommodation is not reasonable if it only provides an opportunity to delay termination). The court's analysis of reasonable accommodation could, in theory, stop here. However, the court will briefly discuss the reasonableness of CMMC's shift-swapping procedure as an accommodation for Ms. Crabtree's religious conflict with working Saturday shifts.

The MHRC has promulgated regulations interpreting whether a voluntary swap is a reasonable accommodation for an employee's religious conflict with their work schedule. According to the MHRC:

> Reasonable accommodation without undue hardship is generally possible where a voluntary substitute with substantially similar qualifications is available. One means of substitution is the voluntary swap. In a number of cases, the securing of a substitute has been left entirely up to the individual seeking the accommodation. The Commission believes that the obligation to accommodate requires that employers facilitate the securing of a voluntary substitute with substantially similar qualifications. Some means of doing this that employers should consider are: to publicize policies regarding accommodation and voluntary substitution; to promote an atmosphere in which such substitutions are favorably regarded; to provide a central file, bulletin board or other means for matching voluntary substitutes with positions for which substitutes are needed.

9

94-348 C.M.R. ch. 3, § 14(2)(C)(1)(a) (2014). CMMC avers that it promoted and encouraged use of its existing shift-swapping procedure. (Def.'s S.M.F. ¶ 32.) Ms. Crabtree avers that CMMC placed all responsibility for finding a replacement for any Saturday shifts with her. (Pl.'s Add. S.M.F. ¶ 45.)

The court cannot conclude on this record that CMMC offered Ms. Crabtree a reasonable accommodation as a matter of law. The degree to which CMMC facilitated shift-swapping, and whether that procedure would have been sufficient to allow Ms. Crabtree to work without violating her religious convictions, are determinations properly left to the factfinder. *See Tabura*, 880 F.3d at 554 ("[U]ltimately the question of whether an accommodation is reasonable must be made on a case-by-case basis, grounded on the specific facts presented by a particular situation.") There remain issues of material fact as to whether CMMC offered Ms. Crabtree a reasonable accommodation.

### Undue Hardship

An employer is only obligated to make reasonable accommodations for its employees' religious practices if doing so would not constitute an undue hardship. *United Paperworkers Int'l Union*, 383 A.2d at 376; *see also* 94-348 C.M.R. ch. 3, § 14(2)(A). "An accommodation constitutes an undue hardship if it would impose more than a de minimis cost on the employer." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 134 (1st Cir. 2004) (quotations omitted). These costs can be economic, "such as lost business or having to hire additional employees to accommodate a Sabbath observer," or non-economic, "such as compromising the integrity of a seniority system." *Id.* The MHRC, for its part, interprets undue hardship in the following manner:

> The Commission will determine what constitutes "more than a de minimis cost"
> with due regard given to the identifiable cost in relation to the size and operating

cost of the employer, and the number of individuals who will in fact need a particular accommodation. In general, the Commission interprets this phrase . . . to mean that costs similar to the regular payment of premium wages of substitutes . . . would constitute undue hardship. However, the Commission will presume that the infrequent payment of premium wages for a substitute or the payment of premium wages while a more permanent accommodation is being sought are costs which an employer can be required to bear as a means of providing a reasonable accommodation. Further, the Commission will presume that generally, the payment of administrative costs necessary for providing the accommodation will not constitute more than a de minimis cost.

94-348 C.M.R. ch. 3, § 14(2)(D)(1). The MHRC will also find undue hardship when accommodating an employee's religious practices would require the employer to deny another employee his or her job or shift preference guaranteed by a bona fide seniority system. 94-348 C.M.R. ch. 3, § 14(2)(D)(2); *see also TWA v. Hardison*, 432 U.S. 63, 80 (1977).

CMMC points to *Sanchez-Rodriguez v. AT&T Wireless*, 728 F.Supp. 2d 31 (D.P.R. 2010), in which the U.S. District Court for the District of Puerto Rico applied the case law stemming from Supreme Court's decision in *Hardison* to scheduling systems more generally. The District Court held that the cases suggested that "compromising a scheduling system that is meant to accommodate the shift preferences of employees would clear the de minimis threshold and constitute an undue hardship."[4] *Id.* at 43. In another case from the District of Puerto Rico, the District Court held that an employer "would suffer undue hardship if it were required to change its scheduling system because of the difficulty of finding a replacement employee of comparable skill, experience, and qualifications; because other employees would be required to work more often during the weekend; and because [the employer] would incur substantial payroll expenses to give [the employee] all Sundays off." *Rojas v. GMD Airlines Services*, 254 F. Supp. 3d 281, 297-98 (D.P.R. 2015).

---

[4] CMMC erroneously cites this case as a First Circuit case. (*See* Def.'s Mot. Summ. J. 14.) The First Circuit did not reach the issue of undue hardship on appeal. *See Sanchez-Rodriguez*, 673 F.3d at 12-13.

11

CMMC argues that any accommodation that would have allowed Ms. Crabtree to avoid working Saturday shifts would have compromised its scheduling system. CMMC argues that it could not avoid scheduling Ms. Crabtree for Saturday shifts because "other employees may be required to work two Saturday shifts in a three-week period as opposed to completing the weekend shift requirement over one weekend." (Def.'s Mot. Summ. J. 17.) CMMC argues that this would not be a popular option for CNAs who prefer to have their weekends off and would be equally unpopular with CNAs that prefer weekend shifts because they might be removed from weekend shifts to accommodate Ms. Crabtree. CMMC argues that this would impact morale among Ms. Crabtree's co-workers.

There is no evidence in the record that CMMC's scheduling system is meant to accommodate the shift preferences of employees. *See Sanchez-Rodriguez*, 728 F.Supp. 2d at 43. CNA is an entry level position; there is no indication from the record that it would be difficult to find an employee to replace Ms. Crabtree for Saturday shifts. *See Rojas*, 254 F. Supp. 3d at 298. CMMC has not demonstrated that it would incur significant payroll expenses by scheduling Ms. Crabtree for two Sunday shifts on different weeks as opposed to consecutive Saturday and Sunday shifts on a single weekend. *See Id.* CMMC's primary argument is that accommodating Ms. Crabtree would be unpopular with other employees and would therefore damage morale. It is questionable that a decrease in employee morale resulting from an accommodation made to allow an employee to practice her religion qualifies as a hardship at all. However, the court need not reach that issue because any effect on employee morale is speculative. *See Cloutier*, 390 F.3d at 135 ("Courts are somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice."). There are still issues of

12

material fact as to whether a disruption to CMMC's scheduling rules qualifies as an undue hardship.

CMMC further argues that its nurse leaders cannot facilitate shift-swapping for Ms. Crabtree. Put simply, CMMC argues that its nurse leaders are too busy to facilitate the process. In CMMC's words:

> Facilitating shift swaps for Ms. Crabtree would involve more than a simple email blast—nurse leaders would need to examine each schedule, identify which CNAs were not scheduled for that shift, and select someone with comparable experience and skill to meet the unit's needs. There would then be a dialogue with that person to determine whether they willing and available to swap, and if so, a follow up conversation with Ms. Crabtree to ensure that she was available to work that employee's original shift. The nurse leader is further constrained by budget concerns and must avoid scheduling employees who would be pushed into overtime by taking an additional shift.

(Def.'s Mot. Summ. J. 18.)

CMMC seems to think that facilitating a voluntary shift swap is a far more involved process than the MHRC has defined it. According to the MHRC, even a simple bulletin board and a favorable attitude towards shift-swapping can be enough to facilitate voluntary swaps. *See* 94-348 C.M.R. ch. 3, § 14(2)(C)(1)(a). Even if these more limited efforts would be insufficient to accommodate Ms. Crabtree in light of her religious belief that precludes her from soliciting her replacement, there are still issues of fact as to whether greater nurse leader involvement in the shift-swapping process for Ms. Crabtree would constitute an undue hardship.[5] The MHRC assumes that the administrative costs necessary for accommodating an employee's religious practice generally do not constitute more than a de minimis cost to an employer. 94-348 C.M.R. ch. 3, § 14(2)(D)(1). CMMC asserts that its nurse leaders do not have the time to facilitate shift swapping, but CMMC does not explain how much time it would take a nurse leader to secure a

---

[5] CMMC also argues that greater nurse leader involvement could hurt employee morale. This argument fails for the reasons stated previously.

13

voluntary swap for one CNA, nor does it account for the possibility of securing a long-term swapping arrangement between Ms. Crabtree and another employee.

Despite claiming that facilitating shift-swapping would be an undue hardship, CMMC acknowledges that it already facilitates shift-swapping for at least one other Seventh-day Adventist employee who is uncomfortable soliciting others to swap shifts with him. (Def.'s S.M.F. 48.) The court cannot grant summary judgment on this record, which amounts to each of the parties advancing their version of the facts they likely plan to present at trial. Undue hardship in this context is a question properly left to the factfinder. There are still issues of material fact as to whether accommodating Ms. Crabtree would be an undue hardship.

Punitive Damages

Under the Maine Act, punitive damages are available if Ms. Crabtree "demonstrates that [CMMC] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the rights of an aggrieved individual protected by this Act." 5 M.R.S. § 4613(2)(B)(8)(c) (2021). The standard of proof applicable to Ms. Crabtree's punitive damages claim is "clear and convincing evidence." *Batchelder v. Realty Res. Hospitality, LLC*, 2007 ME 17, ¶ 22, 914 A.2d 1116.

CMMC argues that even if Ms. Crabtree succeeds on her religious discrimination claim, there is no evidence in the record of malice or reckless indifference. Ms. Crabtree avers that she informed CMMC that she had a religious belief that precluded her from soliciting someone else to work on Saturday. Ms. Crabtree avers that CMMC told her that she would be responsible for finding her own replacement for Saturday shifts regardless. A jury could reasonably conclude that this reflects at least a reckless indifference towards Ms. Crabtree's rights.

There are still issues of material fact as to punitive damages.

14

Substantially Equivalent Employment

Ms. Crabtree has moved for partial summary judgment against CMMC as well. Ms. Crabtree contends that she is entitled to summary judgment on CMMC's affirmative defense of failure to mitigate damages.

Back pay rewarded as relief for an employment discrimination claim is reduced by "actual earnings on another job during the pertinent period or by whatever amount the victim could with reasonable diligence have earned during that time." *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 34, 28 A.3d 610. The employer has the burden to prove that the employee could have mitigated damages by finding other employment. *LeBlond v. Sentinel Serv.*, 635 A.2d 943, 945 (Me. 1993). "As long as the claimant has made some effort to secure other employment, the burden to prove failure to mitigate normally resides with the defendant-employer, which then must show that (i) though substantially equivalent jobs were available in the relevant geographic area, (ii) the claimant failed to use reasonable diligence to secure suitable employment." *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999).

Ms. Crabtree's motion is based on one argument: that CMMC has failed to produce any evidence that substantially equivalent jobs were available to Ms. Crabtree. A recent Federal Court for the District of Maine decision provides a helpful discussion for what employment qualifies as "substantially equivalent:"

> The comparability of other jobs turns on numerous factors—e.g.[,] stature, amount of compensation, job responsibilities, and working conditions. A wrongfully discharged employee need not go into another line of work, accept a demotion, or take a demeaning position, and it is well-established that he need not accept employment that is located an unreasonable distance from his home.

*Mullen v. New Balance Athletics, Inc.*, No. 1:17-cv-194-NT, 2019 U.S. Dist. LEXIS 30967, at *19 (D. Me. Feb. 27, 2019) (citations and quotations omitted).

15

Here, the parties do not dispute that Ms. Crabtree made some effort to find employment, at least prior to 2019. Therefore, it is CMMC's burden to show that there were substantially equivalent jobs in the relevant geographical area. CMMC contends that Ms. Dingley informed Ms. Crabtree that there were alternative positions at CMMC that Ms. Crabtree could apply for, and encouraged her to do so. (Def.'s Add. S.M.F. ¶ 35.) Ms. Crabtree testified that she explored other CNA training opportunities at nearby healthcare facilities. (*Id.* ¶¶ 14-15.) Finally, CMMC proffers Maine Department of Labor reports indicating that the demand for workers in healthcare and social assistance was "above-average" in Central and Western Maine as of 2016, and that there were 687 vacant healthcare support positions in those regions at the same time. (*Id.* ¶¶ 25-26.)

CMMC has produced enough evidence to generate an issue of material fact as to the availability of substantially equivalent employment. Ms. Crabtree argues that none of this evidence speaks to the availability of substantially equivalent employment because CMMC has not produced evidence of a position that offered paid, tuition-free training to become a CNA like CMMC's EWYL program did. CNA is an entry level healthcare position. While an employee need not accept a demotion or go into another line of work to mitigate their damages, this does not mean that substantially equivalent employment is limited to alternative positions with identical benefits. CMMC's EWYL program is part of its compensation package, and would certainly be a factor for the jury to consider in determining whether substantially equivalent positions were available. However, it would not be irrational for a jury to conclude that substantially equivalent jobs were available when a CNA position is, at bottom, an entry level healthcare support position and other entry level healthcare support positions were seemingly available.

16

There remain issues of material fact as to whether Ms. Crabtree mitigated her damages. Plaintiff's motion will be denied.

The entry is

> Defendant Central Maine Medical Center's Motion to Enforce a Settlement Agreement and Motion for Summary Judgment is DENIED.
>
> Plaintiff Helen Crabtree's Motion for Partial Summary Judgment is DENIED.
>
> The Clerk is directed to enter this order into the docket by reference pursuant to M.R.Civ.P. 79(a).

Date: _8 | 30_ , 2021

Harold Stewart, II
Justice, Superior Court

17

HELEN CRABTREE - PLAINTIFF
272 MAIN STREET
AUBURN ME 04210

Attorney for: HELEN CRABTREE
JOHN P GAUSE  - RETAINED 11/01/2019
EASTERN MAINE LAW, LLC, PA
23 WATER STREET, SUITE 202
BANGOR ME 04401


v.

CENTRAL MAINE MEDICAL CENTER - DEFENDANT

Attorney for: CENTRAL MAINE MEDICAL CENTER
MICHAEL MESSERSCHMIDT  - RETAINED 04/11/2019
PRETI FLAHERTY BELIVEAU PACHIOS LLP
ONE CITY CENTER
PO BOX 9546
PORTLAND ME 04112-9546

Attorney for: CENTRAL MAINE MEDICAL CENTER
LAURA RIDEOUT  - RETAINED 09/18/2019
PRETI FLAHERTY BELIVEAU PACHIOS LLP
ONE CITY CENTER
PO BOX 9546
PORTLAND ME 04112-9546

SUPERIOR COURT
ANDROSCOGGIN, ss.
Docket No        AUBSC-CV-2019-00010


DOCKET RECORD

Filing Document:       COMPLAINT          Minor Case Type:    CONSTITUTIONAL/CIVIL RIGHTS
Filing Date:           01/18/2019

Docket Events:

01/18/2019       FILING DOCUMENT - COMPLAINT FILED   ON 01/18/2019

01/18/2019       Party(s):   HELEN CRABTREE
                 ATTORNEY - RETAINED ENTERED   ON 01/18/2018

01/18/2019       Party(s):   HELEN CRABTREE
                 MOTION - MOTION PROCEED W/O FEE FILED WITH AFFIDAVIT  ON 01/18/2019

01/23/2019       Party(s):   HELEN CRABTREE
                 MOTION - MOTION PROCEED W/O FEE GRANTED  ON 01/23/2019
                 MARYGAY  KENNEDY , JUSTICE
                 COPIES TO PARTIES/COUNSEL

03/13/2019       Party(s):   CENTRAL MAINE MEDICAL CENTER
                 SUMMONS/SERVICE - ACK OF RECEIPT OF SUMM/COMP SERVED  ON 03/12/2019
                 THROUGH LOIS DOWNS

03/13/2019       Party(s):   CENTRAL MAINE MEDICAL CENTER
                 SUMMONS/SERVICE - ACK OF RECEIPT OF SUMM/COMP FILED  ON 03/12/2019

04/02/2019       Party(s):   HELEN CRABTREE
                 MOTION - MOTION FOR WITHDRAWAL OF CNSL FILED   ON 03/28/2019
                 WITH MEMORANDUM OF LAW AND PROPOSED ORDER

                 Party(s):   CENTRAL MAINE MEDICAL CENTER